MOORE, Judge.
This court's opinion of February 10, 2017, is withdrawn, and the following is substituted therefor.
*218 T.G.F. ("the mother") appeals from a judgment entered by the Monroe Circuit Court ("the trial court") denying her petition to modify the visitation of D.L.F. ("the father") with S.F. ("the child"), to hold the father in contempt for failing to pay for certain private-school and extracurricular expenses of the child, and to modify the parties' divorce judgment to require the father to pay a portion of the child's private-school and extracurricular expenses.
Procedural History
In September 2011, the trial court entered a judgment of divorce that incorporated an agreement of the parties, which provided, among other things, that the mother would exercise sole physical custody of the child subject to specified visitation rights of the father and that the father would pay child support and 50% of any of the child's noncovered medical, dental, orthodontic, pharmacy, or surgical expenses. The agreement incorporated into the divorce judgment also provided: "Any major decision ... that would require that the [father] pay additional money above child support ... must be agreed to by both parties in advance."
On November 25, 2014, the mother filed a petition seeking to terminate the father's visitation with the child; she also filed an ex parte motion to terminate the father's visitation based on allegations that the father had sexually abused the child. That same day, the trial court entered an order suspending the father's visitation pending an investigation by the Monroe County Department of Human Resources ("DHR") and further orders of the trial court. Based on an agreement of the parties, the trial court later lifted that suspension and ordered that the father would have scheduled daytime supervised visitation. On December 8, 2014, the father filed an answer to the petition and a counterclaim seeking to gain sole legal and physical custody of the child, claiming that the mother had made false allegations against him to the detriment of the child. On June 16, 2015, the mother filed an amended petition seeking to hold the father in contempt of court for his failure to pay certain private-school and extracurricular expenses of the child. She also requested that the trial court clarify the divorce judgment incorporating the parties' agreement regarding the father's responsibility to pay amounts over and above his child-support obligation and/or to amend the divorce judgment to require the father to pay a portion of the child's private-school and extracurricular expenses.
After a trial that ended on October 1, 2015, the trial court's judicial assistant, on January 7, 2016, orally notified the parties that the trial court intended to deny the mother's petition to modify visitation. In response, on January 14, 2016, the mother filed an affidavit signed by the child's therapist indicating that, upon learning that visitation with the father would be resumed, the child had had a severe adverse reaction that had necessitated psychological intervention, reinforcing her opinion that the visitation should not be allowed. The trial court entered a judgment on March 24, 2016, denying the mother's petition and the father's counterclaim, reinstating the father's unsupervised visitation, and declining to hold the father in contempt for failure to pay private-school and extracurricular expenses because, the trial court concluded, the father had not agreed to pay those expenses. On March 31, 2016, the mother filed a postjudgment motion and a motion to stay the aspect of the final judgment allowing unsupervised visitation between the father and the child pending a ruling on the postjudgment motion and appeal.
On April 26, 2016, the mother filed a notice of appeal and moved this court to *219 stay the final judgment pending appeal. However, the notice of appeal was held in abeyance pending disposition of the mother's postjudgment motion, see Rule 4(a)(5), Ala. R. App. P., depriving this court of jurisdiction to grant the motion to stay. See Rule 8(b), Ala. R. App. P. (authorizing this court to stay judgments or orders of a trial court only "pending appeal"). Later that same day, the trial court denied the motion to stay pending before that court. On April 27, 2016, the mother withdrew her postjudgment motion, making her notice of appeal effective to vest this court with jurisdiction, and the mother renewed her motion in this court to stay the final judgment. This court entered an order temporarily staying the judgment, which stay was lifted on May 4, 2016. The mother filed a petition for a writ of mandamus with the supreme court, along with a motion to stay, on May 6, 2016, requesting that the visitation order of the trial court be stayed pending appeal; the supreme court denied the petition and the motion to stay on May 9, 2016.
Facts
I.
The facts relevant to the visitation issue are as follows. The father testified that he and the mother had gotten along well until the child was born, after which, he said, their relationship had quickly deteriorated. The father testified as to a dispute between the parties about feeding the child on the day the child was born. The father moved out of the marital home only three days later, and the mother served him with a divorce complaint not long thereafter.
While the divorce action was pending, the maternal grandmother of the child alleged that she had observed the father sticking his tongue out in the direction of the child's vagina while changing the child's diaper. The father testified that the maternal grandmother had later accused him of performing oral sex on the child. Based on those allegations, the trial court had suspended visitation between the father and the child for three weeks, after which the visitation had been supervised for two or three months. The father testified that the mother had told him during that period that she would not comply with any court order requiring unsupervised visitation between the father and the child. The father further testified that the mother had interfered with his supervised visitation. During the divorce proceedings, the trial court entered an order finding that the mother had violated its pendente lite order concerning supervised visitation. DHR investigated the sexual-abuse allegations and found that child abuse was not indicated. The trial court later reinstated unrestricted visitation.
When the child was six months old, the mother noticed bruising on the child's elbow when the father returned the child from visitation. The mother took the child to the emergency room, and, during the examination, the doctor found bruising on the child's groin area and reported his findings to DHR. DHR investigated and determined that child abuse was not indicated but that the child had been accidentally injured. The mother testified that the father had had nothing to do with the bruising.
The mother testified that, once the parties agreed to divorce in September 2011, they had resumed friendly relations. The mother testified that she had consulted with a psychologist and had read numerous articles on co-parenting, which had led her to encourage the child to have a good relationship with the father following the divorce. After the child turned two years old, the child began having overnight unsupervised visitation with the father. The mother also invited the father to visit with the child beyond his regularly *220 scheduled visitation times. The mother presented multiple photographs taken in 2014 of happy interactions between the mother, the father, and the child, including photographs taken on vacations and other occasions. The father stipulated that the parties had enjoyed a good co-parenting relationship before the mother filed her modification petition in November 2014. However, the father also testified that the mother had consistently caused problems for his visitation, often threatening to report him to DHR, and that the parties had experienced only brief, intermittent periods of cooperative parenting, when he would acquiesce to the mother's demands.
The mother testified that, in the time leading up to the child's scheduled Thanksgiving visitation with the father in 2014, the child began showing symptoms of distress such as becoming irritable, crying, wetting the bed and her pants, clinging to the mother, not eating, having nightmares, and refusing to sleep alone. On the Sunday before Thanksgiving, the child expressed that she did not want to attend the visitation with the father, which was to commence on Wednesday. The mother questioned the child, who, according to the mother, disclosed information that convinced the mother that the father had sexually abused the child.[1] The mother testified that she was shocked by the child's statements. The mother testified that, after the child disclosed the information to her, the child had prayed, the mother had comforted the child, and she and the child had slept together with their hands clasped all night.
According to the mother, the next day she contacted DHR and also filed the modification petition and the motion to suspend the father's visitation. The mother testified that she had not wanted the allegations of sexual abuse to be true but that she had wanted to have those allegations fully investigated. Jane Agee, a social worker employed by DHR, instructed the mother to take the child for a physical examination and, afterwards, to see Niki Whitaker, the executive director of Baldwin County's Child Advocacy Center. The mother testified that the physician who had performed the physical examination on the child had found no physical evidence of abuse.
On December 2, 2014, Whitaker conducted a forensic interview of the child. The mother testified that she had instructed the child to tell the truth during the forensic interview, which both Agee and Whitaker testified would be a proper instruction. However, Agee also testified that, during the forensic interview, the child had said that the mother had told her what to say. Agee testified that she and a law-enforcement officer from Monroe County had observed the interview through a one-way window. Agee testified that the child had been talkative but that the child had not cried, urinated, or otherwise acted in an alarming or unusual manner. Whitaker testified that the child had demonstrated through a baby doll that the father had used his fifth finger to touch the child's vagina. Whitaker testified that she was concerned for the child, who, she said, had expressed a strong desire not to be with the father; however, Whitaker testified that, based solely upon the forensic interview, she "could not rule in or rule out sexual abuse" and that she had informed Agee and the law-enforcement officer that a more extensive six-week forensic interview could be provided by a therapist on staff. Agee testified that, because the *221 trial court had imposed a restriction requiring that any visitation between the child and the father be supervised, she had considered the child to be sufficiently protected and therefore had not recommended further forensic interviews. Whitaker testified that she had also suggested that DHR search through the father's cellular telephone to try to corroborate some of the things the child had stated that she had seen on his telephone. Agee testified, however, that DHR does not take custody of cellular telephones.
Agee interviewed the mother and the father as part of her investigation, both of whom, she said, had been cooperative. Agee testified that law-enforcement officers also had investigated the matter, but she was unaware of whether any action had been taken by the Monroe County District Attorney's office based on the allegations of sexual abuse. The father testified that he had fully cooperated with all investigations and that he had submitted to hours of interviews. The father testified that he had even offered to grant law-enforcement officers access to his cellular telephone, although he had not given them his telephone. Agee testified that, after 90 days, she had filed a required disposition report stating that she was "unable to complete" the investigation. Agee testified that she had entered that finding because she had found a lack of credible evidence to support whether sexual abuse had or had not occurred. The letter notifying the father of the disposition states, however, that a finding of "unable to complete" means that "sufficient evidence was unable to be obtained to complete the assessment." Whitaker and Willie Frye, a DHR caseworker, also defined "unable to complete" in the latter manner. Furthermore, Whitaker testified that DHR's policy suggests that the "minimal standard for investigation" of a sexual-abuse allegation requires DHR to conduct more than one interview with the child and a conversation with the parents in order to make a determination. Agee testified that she had no opinion regarding whether the child would be safe having unsupervised visitation with the father.
Whitaker testified that the mother could not arrange for the six-week forensic interview without a referral from DHR or the multi-disciplinary team assigned to the case. The mother testified that, after she received the letter from DHR closing the investigation, she had consulted with Dr. Bridget Smith, a licensed psychologist in private practice. Dr. Smith testified that, since April 2015, she had spent approximately 10 clinical hours with the child, over 7 sessions, for the purpose of diagnosing and treating the child. Dr. Smith testified at trial for the mother at a rate of $250 per hour, and the mother testified that she had paid Dr. Smith $5,000 for treating the child. Dr. Smith testified that her "fee has nothing to do with my clinical opinion and my desire to advocate for children who I think are in unsafe environments."
Dr. Smith testified that the child had disclosed that the father had subjected her to inappropriate sexual touching. Specifically, she testified that the child had reported that the father had sexually touched her vaginal area; she testified that the child had spontaneously disclosed the touching on four separate occasions while playing, as well as on a "Kinetic family drawing," on an "incomplete sentence blank," and after reading a book called "My Body is Private." Dr. Smith testified that the incomplete sentence that the child had completed was "I get mad when" and that the child had answered "Daddy." She testified that she had asked the child "why Daddy" and that the child had answered that he had told her to keep a secret. When asked what the secret was, *222 the child put her finger in the vaginal area of a doll. Dr. Smith testified that, after she and the child had read the "My Body is Private" book, she had asked the child if anyone had made her feel uncomfortable and that the child had answered that her "Daddy" had; according to Dr. Smith, the child had then squatted and put her finger in her own vaginal area. Dr. Smith also testified that, when she drew a stick picture of a little girl, the child had wanted a red marker because she was upset and that the child had drawn an arrow to the vaginal area. Dr. Smith testified that the child had further disclosed that when the father had touched her it made her uncomfortable and scared.
Whitaker testified that Dr. Smith had informed Whitaker that the child had made spontaneous disclosures similar to those that had been made in Whitaker's forensic interview of the child and that, in her opinion, the consistency of the disclosures boosted the child's credibility. Whitaker testified that, based on her interview, she had some concerns about the father's having unsupervised visitation with the child. Dr. Smith testified that her discussion with Whitaker had reinforced her opinion that the child had been sexually abused.
Dr. Smith testified that she has a strong opinion that the child's allegations of sexual abuse have not been fabricated. Dr. Smith testified that it would be unusual for a mother, who has taken a child on outings with the child's father and has taken photographs of the father and the child while on those outings, to make up an allegation of sexual abuse. Dr. Smith also testified that, generally, false allegations are made during a divorce or shortly thereafter. Dr. Smith testified that, in her opinion, the allegations made against the father in the past were not directly relevant to the child's most recent allegations because the parents had successfully co-parented for a long period between the complaints.
Dr. Smith testified that the child had shown "fairly common symptoms" of sexual abuse through her physical behavior in November 2014 as described by the mother's testimony. Dr. Smith also testified that the child had been very consistent in her disclosures and that she had exhibited the emotions and affect expected in an abuse victim in her disclosures. Dr. Smith testified further that she had previously determined in cases involving other parties that a parent had been coaching his or her child to make false allegations of sexual abuse, but, she said, she had no concern that the child had been coached in this case. She testified that there was no way the mother could have known what she was going to ask the child because her questions are different with every child and, therefore, the mother could not have prepared the child for some of the things that she and the child had discussed. Dr. Smith also explained that the child had not used inappropriate language or sought approval from her or the mother for the disclosures, which, she said, are both common signs of coaching. Dr. Smith also noted the consistency in the detail of the child's disclosures. Dr. Smith testified further that the clinical data supports that the child has been sexually molested and that it is typical for sexual touching to leave no physical evidence.
On cross-examination, Dr. Smith acknowledged that a child can be manipulated by one parent to tell untruths against another parent. Dr. Smith admitted that it would "raise red flags" if the mother had told the child what to say in the forensic interview. However, Dr. Smith maintained that, in this case, she did not believe the mother had coached the child. Dr. Smith did not know that the trial court had previously denied a petition filed by the mother *223 to modify the father's visitation based on the allegations made by the maternal grandmother, but, she said, she did not believe that that fact, or the fact that the maternal grandmother still resided with the mother, would alter her opinion. Dr. Smith also agreed that DHR did not find enough evidence to indicate that sexual abuse had or had not occurred. However, Dr. Smith testified on redirect examination that she had supplied the further evaluation that DHR was missing. Dr. Smith acknowledged that her clinical data and her opinion could be wrong.
When shown photographs of the child during recent visits with the father, Dr. Smith testified on cross-examination that the child did not appear to be scared. On direct examination, Dr. Smith testified that it is not uncommon for an abused child to love his or her abuser and to want to see the abuser. The mother testified that the child loves her father. Also on redirect examination, Dr. Smith testified that the photographs did not negate her finding of sexual abuse. Dr. Smith recommended that the father's visitation should remain supervised at all times. The mother testified that the child had been doing well under the supervised-visitation arrangement and that she felt like the child was recovering.
The father denied having touched the child inappropriately. The father admitted that he and his girlfriend had exchanged erotic images of themselves over the telephone. The father also testified that he had viewed pornography up until a year before the trial, but had stopped without seeking any professional assistance in order to end any questions about his "sexual life." The father denied that he viewed pornography while the child was visiting with him or that the child had witnessed pornography on his telephone or computer. The father also denied that he had photographed the child while undressing or while the child was nude.
The father admitted that he had been discharged from the United States Navy due to his having a personality disorder, which he described as "shyness." He testified that a physician had prescribed medication for that disorder but that he did not take that medication because he did not feel like he needed it. The father testified that he had taken other people's medication, but had stopped when informed that the practice was illegal.
The father testified that the mother had filed her modification petition as a result of an ongoing dispute between the parties concerning his visitation. The father complained that the mother had sought to control the child's activities and environment while with the father, such as by demanding that he not expose the child to his cats, to his cigarette smoke, and to the dust at his house and that he follow a specific diet plan for the child; he acknowledged, however, that those restrictions had been medically indicated due to the child's allergies. The father characterized the mother's petition as the third in a series of false allegations made by the mother in an attempt to erase him from the child's life, although he admitted that the mother had included the father in the child's life, as evidenced by the photographs that had been taken in 2014. The father testified that the mother was harming the child by raising false allegations of sexual abuse and thereby making the child distrustful of men. The mother denied that she would harm the child by raising false allegations of sexual abuse against the father.[2]
*224 II.
The evidence relevant to the remaining issues on appeal is as follows. The father testified that he had agreed to the provision in the settlement agreement that called for him to pay costs for the child "above child support" if both parties agreed in advance to those costs. The father testified that the parties had made decisions regarding the child jointly and that, when those decisions had resulted in financial costs, the parties had equally shared the expenses. The father admitted that he had agreed in advance to pay one-half of the costs of the child's private-school tuition and one-half of the costs of the child's gymnastic and piano lessons.
The father testified that he had ceased all payments when he was served in the modification action because he had to use those funds to finance the litigation and could no longer afford the costs. The father testified that he had made $70,000 in 2015 and that he and his current wife paid $4,341 per month for living expenses, leaving them with $700 per month in disposable income. The father testified that he had paid for his April 2015 wedding and a cruise by selling a truck. The mother testified that she had paid $6,313 for tuition, $750 for gymnastic lessons, and $2,485 for music lessons, the majority of which had been for piano lessons. The mother requested that the father reimburse her one-half of those payments.
Discussion
I.
On appeal, the mother argues that the trial court erred in allowing the father to resume visitation with the child without limiting the visitation to daytime supervised visitation. The mother essentially asserts that the evidence does not support the trial court's determination that the father should be allowed unsupervised visitation. The trial court did not make specific findings of fact to support its visitation determination.
"[I]n a nonjury case in which the trial court makes no specific findings of fact, a party must move for a new trial or otherwise properly raise before the trial court the question relating to the sufficiency or weight of the evidence in order to preserve that question for appellate review."
New Props., L.L.C. v. Stewart, 905 So.2d 797, 801-02 (Ala. 2004). In this case, the mother filed a postjudgment motion in which she argued, at length, that the evidence did not support the trial court's visitation determination. However, the mother later withdrew the postjudgment motion without receiving a ruling on the motion. We nevertheless conclude that the mother properly raised the question of the sufficiency of the evidence to support the award of unsupervised visitation by filing a brief following the trial setting forth her position that the evidence would support only a denial of visitation. See Vines v. Vines, 195 So.3d 985 (Ala. Civ. App. 2015) (considering issue of sufficiency of evidence to have been properly preserved by the filing of a posttrial brief despite absence of postjudgment motion).
In Stewart, our supreme court explained that the purpose of filing a postjudgment motion is to afford " 'the trial judge an opportunity to carefully review the evidence and to perfect the issues for review on appeal.' " 905 So.2d at 801 (quoting Ex parte Vaughn, 495 So.2d 83, 87 (Ala. 1986) ). In this case, the trial court had that *225 opportunity because the mother summarized the evidence in her posttrial brief and expounded on her legal arguments as to why visitation should be denied. Although the trial court did not rule on the postjudgment motion because it was withdrawn, under Vines we presume that the trial court, by awarding the father unsupervised visitation following its review of the posttrial brief, determined that the evidence was sufficient to justify its award.
We find that the trial court could reasonably have reached its factual determination that unsupervised visitation served the best interests of the child. The trial court received conflicting evidence regarding whether the visitation between the father and the child should be supervised. One aspect of the evidence indicates that the mother had previously interfered with the father's visitation in violation of a court order, that the mother had indicated that she did not want the father to have unsupervised visitation, and that the mother had litigated an unproven allegation of sexual abuse lodged by the maternal grandmother against the father during the divorce proceedings in order to deny him that visitation. Given that context, the trial court could have viewed the latest charge of sexual abuse, which arose just before an extended unsupervised-visitation period between the father and the child, skeptically.
The mother testified that the child had acted extremely distressed when disclosing the alleged sexual abuse, but Agee testified that the child had not exhibited such unusual behavior during the forensic interview. Neither Whitaker nor Dr. Smith testified to observing such behavior. Whitaker could not definitively determine that the child had been sexually abused based on the forensic interview. Dr. Smith testified that she believed that the child had been sexually abused by the father, but Dr. Smith, who describes herself as an "advocate" for children she considers to be in unsafe environments, admitted that her clinical data and her conclusion could be wrong. The trial court also heard evidence indicating that, while the action was pending, the child had been visiting with the father regularly without incident since at least January 2015, and the trial court observed photographs of the child interacting with the father without fear. The trial court also observed the demeanor of the father when he denied any inappropriate touching and the demeanor of the mother when questioned regarding whether she had fabricated the sexual-abuse allegation. From the totality of that evidence, the trial court could have determined that the mother did not prove that the father posed a sexual threat to the child.
We acknowledge that the mother presented a great deal of evidence supporting her claim that the visitation should be supervised to protect the child from sexual abuse by the father. However, the trial court ruled against the mother on that point, impliedly finding that the father had not sexually abused the child. See Espinoza v. Rudolph, 46 So.3d 403, 405 n.2 (Ala. 2010) ("[W]here the record is silent as to the trial court's findings of fact on a disputed issue, we assume that the trial court made those findings necessary to support the judgment."). In cases in which a trial court hears oral testimony, placing it in a superior position to evaluate the demeanor and credibility of the witnesses, this court must defer to the trial court's factual findings and its ruling based on those findings. Dunn v. Dunn, 972 So.2d 810, 815 (Ala. Civ. App. 2007). This court may not substitute its judgment for that of the trial court or reverse a judgment because it might have found the facts differently than did the trial court. Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001). Thus, *226 we affirm that aspect of the judgment denying the mother's petition to modify the father's visitation. See Alexander v. Alexander, 625 So.2d 433, 435 (Ala. Civ. App. 1993) (holding that a trial court's decision on visitation will not be reversed unless the trial court has exceeded its discretion).
II.
The mother also argues that the trial court erred in declining to hold the father in contempt for failing to pay for one-half of the child's private-school tuition and one-half of the fees for the child's gymnastic and piano lessons. The mother further complains that the trial court failed to clarify the father's ongoing obligations to pay those costs under the divorce judgment by interpreting or modifying that judgment.
The divorce judgment unambiguously requires the father to pay costs for the activities of the child to which the parties have jointly agreed in advance. In its judgment, the trial court found that the father had not "agree[d] to pay in advance" for the expenses at issue. However, the father admitted that he had agreed in advance to the child's attending private school and receiving gymnastic and piano lessons and that he had paid one-half of those expenses until the mother filed her petition in this case. When the material facts are established by undisputed evidence, a judgment based on a factual finding inconsistent with the undisputed evidence cannot stand on appeal. Salter v. Hamiter, 887 So.2d 230, 233-34 (Ala. 2004). Accordingly, we reverse the trial court's judgment on this point and remand this cause for the trial court to reconsider, in light of this opinion, its rulings on the mother's contempt motion and the mother's motion to clarify or to modify the divorce judgment regarding the father's obligation to pay for the child's private-school and extracurricular expenses.
Conclusion
Based on the foregoing, we affirm the trial court's judgment to the extent that it awarded the father unsupervised visitation with the child. We reverse the judgment insofar as it addresses the issue of private-school and extracurricular expenses and remand this case for the trial court to reconsider its rulings on the mother's contempt motion and motion to clarify or modify the divorce judgment in accordance with our instructions above.
APPLICATION GRANTED; OPINION OF FEBRUARY 10, 2017, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Pittman, J., concurs.
Donaldson, J., concurs specially.
Thompson, P.J., and Thomas, J., concur in part and dissent in part, with writings.
DONALDSON, Judge, concurring specially.
I concur. The judgment in this case was entered after a trial conducted in accordance with the requirements of law. From my review of the record and the briefs of the parties, I am unable to identify any procedural irregularities or substantive errors of law that occurred during the proceedings that would permit an appellate court to reverse the judgment as to the issue of visitation. Thus, the judgment, insofar as it addresses visitation, may not be reversed without overturning the trial judge's assessment of the credibility of the witnesses. The law does not permit this court to do so.
*227 " 'It was within the province of the trial court to consider the credibility of the witnesses, to draw reasonable inferences from their testimony and from the documentary evidence introduced at trial, and to assign such weight to various aspects of the evidence as it reasonably may have deemed appropriate.... In order to reverse the trial court ..., we would have to make our own credibility determinations and we would have to reweigh the evidence, neither of which we are allowed to do.' "
Vestlake Cmtys. Prop. Owners' Ass'n, Inc. v. Moon, 86 So.3d 359, 367 (Ala. Civ. App. 2011) (quoting Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala. Civ. App. 2005) ).
Reasonable judges might disagree as to whether the judgment, insofar as it addresses visitation, is in the "best interest" of the child. These types of cases "are among the hardest to deal with and courts are seldom satisfied in all respects with the results reached." Mothershed v. Mothershed, 348 So.2d 501, 502 (Ala. Civ. App. 1977). But only one judge actually saw and heard the parties and the witnesses, and that is the trial judge. Resolving disputed facts in highly emotional cases affecting lives, liberty, or property is part of the job placed squarely upon the trial judge's shoulders because that judge personally interacts with the people involved. Deferring to such decisions of the trial judge is not a matter of courtesy or protocol. It is a recognition that decisions based on assessments of the traits and character of people-e.g., where a child lives or with whom a child visits, whether a criminal defendant receives probation, the extent of pain felt by an injured employee, etc.-are best left to the judge who has actually seen and heard from the people involved and should not be made on cold records from distant offices.
"This 'what is best for the child' rule prevails over presumptions and has probably caused judges more sleepless nights than any other one legal or equitable principle. It is an awesome responsibility, fraught with difficulty, to determine the best welfare of children. The trial judge observes attitudes, facial expressions, voice tones and all human traits in parties and witnesses testifying and appearing before him, weighs the evidence, wishes for the wisdom of Solomon, and hopefully reaches the correct decision in the case. This unique opportunity to observe and hear is the primary reason for the strong presumption favoring the trial court's findings in cases of this nature."
Ashley v. Ashley, 383 So.2d 861, 863 (Ala. Civ. App. 1980) (citing Mothershed, supra).
Finally, the admission of testimony from a witness hired by a party and presented as an expert does not mean the fact-finder must assign any particular weight or assessment of credibility to the testimony. See, e.g., McCurry v. Gold Kist, Inc., 647 So.2d 732, 734 (Ala. Civ. App. 1993) ("A trial court is not bound by the testimony of expert witnesses, even if that testimony is uncontroverted."); Patrick v. FEMCO Se., Inc., 565 So.2d 644, 645 (Ala. Civ. App. 1990) (noting that, in a nonjury case, "[t]he trial court is the trier of fact and weighs all of the evidence, including the expert's testimony, and then decides what to do"). As with all witnesses, such testimony must be carefully evaluated for bias, motive, and other matters that may affect factual findings. Experienced litigators and trial judges know that such testimony at times does not actually provide evidence grounded in scientific, technical, or other specialized knowledge as contemplated by Alabama Rule of Evidence 702 but is, instead, virtually indistinguishable from advocacy.

The mother was not allowed to testify as to the child's communications based on a sustained hearsay objection.

We have not included in our recitation of the facts the information contained in the affidavit signed by Dr. Smith, which was filed by the mother on January 14, 2016. Nothing in the record indicates that the trial court reopened the evidence to accept the affidavit or that the trial court considered the affidavit in rendering its final judgment. See J.S.M. v. P.J., 902 So.2d 89, 91 n.2 (Ala. Civ. App. 2004) (noting that this court had not considered evidence submitted in support of a postjudgment motion when the record did not indicate whether the trial court had considered that evidence).