MOORE, Judge.
N.G. (“the father”) and P.G. (“the mother”) appeal from a judgment of the Blount Juvenile Court (“the juvenile court”), which was entered in three separate actions, finding H.G., Ha.G., and J.G. (“the children”) dependent. We affirm the juvenile court’s judgment.

Procedural History

On March 2, 2015, the Blount County Department of Human Resources (“DHR”) filed separate petitions alleging, among other things, that the children were dependent. On that same day, the juvenile court entered a separate shelter-care order as to each child, placing temporary custody of the children with DHR, pending a hearing, and directing the Blount County sheriffs office to assist DHR with taking the children into its custody. Following a hearing, the juvenile court entered an order on March 11, 2015, listing the case numbers for all three children and placing the children in DHR’s custody. Among other things, that order noted that the court had been advised that an agreement had been reached to place the children in the shelter care of DHR. On May 6, 2015, the mother and the father filed a motion to dismiss each case, asserting that the children were no longer dependent. A hearing was held on September 29, 2015. On November 4, 2015, the juvenile court entered a single judgment that disposed of each of the dependency petitions. That judgment, among other things, found the children dependent and placed the children in DHR’s custody. The mother and the father filed a motion to alter, amend, or vacate the juvenile court’s judgment on November 16, 2015; that motion was denied on November 23, 2015. The mother and the father filed a timely notice of appeal in all three cases on November 30, 2015.

Facts

Donna Southern, an investigator for DHR, testified that she had first met the father on February 27, 2015, at the Blount County Courthouse in response to a report that had been made to DHR that the father was trying to obtain a protection-from-abuse order against the mother. According to Southern, when she met the father at the courthouse, he was wearing a hospital gown and sweatpants and he informed her that the mother had shot him twice at their house in the early morning hours of February 27, 2015. Both Southern and Amanda Maynard, a foster-care caseworker for DHR who took over the cases from Southern, testified that the father had told them on separate occasions that, because the mother had purportedly abused her medications, he and the mother had agreed for him to monitor her medications and to distribute them to her;[1] that, on the night of the shooting incident, the father was going to retrieve the mother's medications from an outbuilding outside the family’s house; that, while his back had been turned, the mother had shot him; that he had turned around and stated, “[P.G.], you shot me”; that the mother had shot him again; and that he had taken off running after the second shot. Southern testified that, when she *1230 met the father at the courthouse, he was wearing bandages and slings and had an abrasion to his face, which the father had told her was the result of the mother’s having attacked and choked him earlier on the day of the shooting incident. According to DHR’s dependency petitions, an ex parte protection order awarding the father temporary custody of the children and exclusive possession of the marital home had been entered by the Blount Circuit Court,
Southern stated that, following her meeting with the father, DHR had obtained a pickup order for the children and that, when she arrived at the family’s house, the mother had been present. According to Southern, based on her experience, it appeared that the mother was under the influence of drugs on that occasion because her speech was slurred and she was “nodding out.” Southern testified that the mother had stated that she had not shot the father, that the father was involved with “shady people,” that he had been selling drugs for drug dealers, and that she believed that one of the drug dealers had shot him. According to Southern, while she was at the house, the father appeared at the house with the deputies who had gone to the house with Southern to serve the mother with the father’s protection-from-abuse order. Southern stated that the father had not been angry at the mother, that he had declined to press charges against her, and that he had stated that he just wanted her to get some help and that he loved her.
Southern testified that she had spoken to the mother on February 28, 2015, and that the mother had maintained at that time that drug dealers had shot the father, that, three weeks before the shooting, the father had spanked one of the children with a belt and had left a bruise, and that the father had taken some of her medications and had been “high.” Southern stated that she next spoke to the mother and the father at the shelter-care hearing on March 2, 2015, and, according to Southern, the mother had appeared to be under the influence of drugs at that time because she was nodding, her eyes were closing, and her speech was slurred. Southern stated that, after that date, she had not had any further contact with the mother and the father and the cases had been turned over to Maynard.
Maynard stated that she had first met the mother and the father on March 2, 2015, at the 72-hour shelter-care hearing. She stated that the father’s behavior on that date had been “a little erratic” in that he was very loud and “hard to follow,” and, she said, the mother had appeared to be under the influence of medication because her speech was slurred and she could not hold her head up or keep her eyes open. According to Maynard, the father had maintained on that date that the mother had shot him twice in the back. Maynard stated that an Individualized Service Plan (“ISP”) meeting had been conducted at the shelter-care hearing and that they had discussed that DHR had wanted each parent to undergo a psychological evaluation to determine why the shooting had occurred.
Maynard testified that she had visited the family’s house on March 11, 2015, that the father had been present, and that he had walked her along the property as he recounted the story of the shooting. She stated that the mother had been staying with her aunt near the property on that occasion but that she had seen the mother, who had appeared to Maynard be under the influence of medication because she could not stand on her feet, she was very wobbly, and she was slurring her words. According to Maynard, the mother had stated that she had been out of her medicine for approximately two weeks, that her blood pressure had been very high because *1231 of anxiety, and that she had gone to the emergency room, where they had given her a shot of Demerol, a prescription pain medication.
Maynard stated that she had held a 30-day ISP meeting on April 17, 2015, at DHR’s headquarters, where she had discussed with the parents supervised visits, psychological evaluations, marriage counseling, domestic-violence counseling, and possible random drug screenings, and, she said, they had been very cooperative. She testified that she had scheduled psychological evaluations for the mother and the father and that the mother had stated at a later home visit that she was going to begin an outpatient drug-treatment program at “Hope House”; however, at the time of the final hearing, neither the mother nor the father had submitted to a psychological evaluation and the mother had not been to Hope House for a drug assessment or classes. Maynard stated that she had been unable to get in touch with the mother and the father to set up random drug screens because they would never return her telephone calls. She stated that she had not had consistent contact with the mother and the father in the three months preceding the final hearing despite having made telephone calls, having left messages, and having sent a letter. According to Maynard, of 26 visits that had been scheduled with the children, the father had missed 4 of the visits and the mother had missed 16. She stated that the father had contacted her in advance to cancel 3 of his 4 missed visits but that the mother had not provided any advance notice that she would miss any of the 16 visits she missed, although, she said, the mother had missed 2 of the visits because the protection-from-abuse order was still in effect.
Maynard testified that the mother had maintained that she had not shot the father; she also stated that the father had later told her that his back had been turned during the shooting and that he did not know what had happened. Maynard testified that, in approximately July 2015, the father had told her that he and the mother had been advised by their attorney not to participate in the psychological evaluations. She stated that the father had also confirmed at that time a report that had been made to DHR indicating that the husband of a woman with whom the father was having an affair had shot the father. Maynard stated that the father had declined to give her the name of the shooter because he had been advised by whoever had shot him that there would be repercussions if the father involved that person. Maynard testified that, in her opinion and in DHR’s opinion, the parents’ house is not safe for the children because there are domestic-violence concerns and because the mother’s instability and abuse of her prescription medications may be an issue. She stated that DHR cannot be sure that another shooting incident will not occur at the house and that the father’s claims that someone other than the mother had shot him needed to be investigated further. Maynard testified that the father had told her that he and the mother have to have help with the children because of the mother’s health conditions. She stated that the father had asked his oldest daughter, who is not involved in these proceedings, to help with the children when they began home-schooling because the mother was suffering from severe depression at that time. Maynard stated that, because of the questions surrounding the shooting, the mother’s mental health, and the mother’s having appeared under the influence of drugs at times since the outset of the cases, it was her opinion that the house was not safe for the children.
Maynard testified that there had been previous incidents of violence involving the *1232 family; specifically, she testified that, in approximately 2003, the father had filed a police report claiming that the mother had pulled a gun on him and that, during that incident, the mother and the father had each claimed that the other had threatened to kill him or her. She stated that the mother had filed a protection-from-abuse petition at that time that indicated that the mother was worried about the father because he had hit her and had threatened to kill her. Maynard stated that that incident had caused the Jefferson County Department of Human Resources to remove H.G. from the family’s house due to domestic-violence issues, but, she said, H.G. had been returned to the custody of the parents and, as far as she knew, the family had been together without incident from 2003 until February 2015.
Monica Keller, an employee of the Youth Advocate Program, which supervises visitations and the interaction between parents and children, testified that she had been contacted by DHR to provide services to the mother and the father. She stated that she had supervised approximately 24 visits, that the father,had been present for 19 of the scheduled visits, and that the mother had been present for 9 of the scheduled visits. Keller stated that the father had interacted appropriately with the children during the visits, that the mother had appeared to be very -disengaged, that the mother had .been very distant, and that the mother had not evenly split her attention among the children.
The father admitted that, on the day of the shooting incident, -he had told law-enforcement officers that the mother had shot him; that he had gone to the courthouse the next day to file a petition for a protection-from-abuse order against the mother; that he had signed that petition under oath, stating that the mother had shot him twice; that he had told Southern and the judge that had issued the protection-from-abuse order that the mother had shot him; that he had also told Southern that the mother had scratched his face earlier in the day on the day of the shooting incident; that he had stated in court on March 2, 2015, that he did not want to press charges against the mother and that he just wanted her to get help; and that he had showed Maynard where the mother had allegedly shot him at their house. He testified also that he had stated that the mother had abused her medications and that there had been occasions when he had not been able to wake her up. The father testified, however, that those statements had been lies.
The father testified that he had been having an affair with another woman and that he had said that the mother had shot him because, he said, he had some problems with their marriage “going back long term” because the mother had had medical issues following a hysterectomy and they had not had “desires toward each other in nearly a year.” The father testified that he had wanted a divorce for a long time and that he did not want the mother to receive all the assets of the marriage. He stated that he wanted the assets of the marriage and custody of the children and that he had seen the opportunity “to take it from [the mother]” after “being caught in what [he] was doing.” When asked the name of the individual with whom he was having an affair, the father testified that her name was “Dana,” that they “dealt on a first-name basis,” and that he had begun meeting her at a service station down the road from his house. The father testified that the affair had lasted several months, that they had not exchanged addresses until Dana became pregnant, and that he had given her his address so that they could meet and discuss the situation on the night of the shooting incident. He stated that he had been shot when he went to *1233 meet her and that he believed that Dana’s husband had shot him. According to the father, approximately two weeks after the shooting incident, he had been approached by a man at the service station where he had met Dana and the man had informed him that Dana and her husband had moved out of the state and that they were raising the baby as their own child. The father testified that he was no longer seeking a divorce from the mother.
The mother testified that she did not shoot the father and that she was not abusing drugs. The mother stated that she had missed some visitations-with the children because of “[h]ealth, death, and lies.” She stated that she did not know about the affair until May 2015, when the father had admitted the affair to her. The mother testified that she had missed only seven visits with the children and that Maynard had lied about not being able to get in touch with her and the father.

Analysis

The mother and the father first argue on appeal that the juvenile court erred in finding the children dependent.
“As a matter of constitutional law, a parent who has exercised custody over a child has a prima facie right to the continued custody of the child. See In re Moore, 470 So.2d 1269, 1270 (Ala.Civ. App.1985). The presumptive right of parents to the custody of their child may be overcome by clear and convincing evidence demonstrating that the parents are currently unable to discharge their responsibilities to and for the child and that the child requires additional care and supervision through the state, i.e., that the child is ‘dependent.’ See Ala. Code 1975, § 12-15-102(8)a.6; see also Y.W. v. G.W., 990 So.2d 414, 417 (Ala. Civ.App.2008) (quoting K.B. v. Cleburne County Dep’t of Human Res., 897 So.2d 379, 389 (Ala.Civ.App.2004) (Murdock, J., concurring in the result)) (‘ “[I]n order to make a disposition of a child in the context of a dependency proceeding, the child must in fact be dependent at the time of that disposition.” ’). ‘Clear and convincing evidence’ is defined as
“ ‘ “[elvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.” ’
“L.M. v. D.D.F., 840 So,2d 171,179 (Ala. Civ.App.2002) (quoting Ala.Code 1975, § 6-ll-20[ (b) ](4)).
“On appeal from a judgment finding a child dependent following an ore tenus proceeding, we presume the juvenile court’s factual findings are correct. J.W. v. C.H., 963 So.2d 114,119 (Ala.Civ. App.2007). Those findings will not be disturbed if they are supported by sufficient evidence. Ex parte Floyd, 550 So.2d 982, 984 (Ala.1989). In passing on the question of the .sufficiency of the evidence as to a finding of dependency, this court does not reweigh the evidence; instead, this court determines whether the juvenile court, acting in its fact-finding role, reasonably could have determined from its own weighing of the evidence that the dependency of the child was proven by clear and convincing evidence as that standard is defined above. J.B. v. DeKalb County Dep’t of Human Res., 12 So.3d 100, 112 (Ala.Civ, App,2008).”
R.F.W. v. Cleburne Cty. Dep’t of Human Res., 70 So.3d 1270, 1272 (Ala.Civ.App. 2011). See also Ala.Code 1975, § 12-15- *1234 311(a) (“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that a child is dependent, the juvenile court may proceed immediately, in the absence of objection showing good cause or at a postponed hearing, to make proper disposition of the case.”).
“We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court’s resolution of the facts is plainly and palpably wrong. L.R.M. v. D.M., 962 So.2d 864, 873-74 (Ala.Civ.App.2007) (citing Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala.Civ.App.1994), quoting in turn Young v. Young, 376 So.2d 737, 739 (Ala.Civ.App.1979)). ‘ “[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.” ’ Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004) (quoting Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003)). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:
“ ‘The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited—factfinding.’
“Ex parte R.T.S., 771 So.2d 475, 477 (Ala.2000).”
“J.B. v. Cleburne Cty. Dep’t of Human Res., 992 So.2d 34, 39-40 (Ala.Civ.App. 2008).
Section 12-15-102(8), Ala.Code 1975, defines a “dependent child” as one
“who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
[[Image here]]
“2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.
[[Image here]]
“8. Who, for any other cause, is in need of the care and protection of the state.”
In the present cases, the juvenile court found that the father’s “claim of being shot by an unknown jealous husband is not credible.” With regard to the ore tenus rule, this court has stated that,
“[bjecause appellate courts do not weigh evidence, particularly when ‘the assessment of the credibility of witnesses is involved,’ Knight [v. Beverly Health Care Bay Manor Health Care Ctr.], 820 So.2d [92] at 102 [ (Ala.2001) ], we defer to the trial court’s factual findings. ‘The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court’s findings because of that court’s unique ability to observe the demeanor of witnesses.’ Id.; see also Fitzgerald v. Jeter, 428 So.2d 84, 85 (Ala.Civ.App.1983), and Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1185 (Ala.Civ.App.2007). The father gave at least two diametrically opposed versions of the events of his shooting. The juvenile court determined, based on its assessment of the father as he testified, that the father’s first version of events—that the mother had shot him— was true and that the second version of events—the jealous-husband story—was not true. This court is bound by that determination.
The credible evidence as accepted by the juvenile court shows that the moth *1235 er shot the father twice in the back; that the mother had abused her medications to the extent that she had shot the father; that the father had run away from the family’s house after being shot, leaving the children with the mother; and that the mother and the father continued living together at the time of the dependency hearing. Additionally, the juvenile court noted in its judgment that the mother had “appeared incapacitated, unable to open her eyes or hold up her head, and having slurred speech, on at least three occasions since February 27, 2015, including [on] March 2, 2015, before this court.” Testimony of both Southern and Maynard also indicated that the mother had appeared to be under the influence of drugs, having slurred her speech and having been unable to hold her head up or keep her eyes open, on different occasions since they had become involved in the cases. Thus, the evidence supports a finding that the mother’s condition would necessarily affect her ability to provide for the care of the children. Based on the mother’s condition and the domestic violence between the mother and the father, we conclude that the juvenile court reasonably could have been clearly convinced that the children are dependent.
The mother and the father next argue on appeal that the juvenile court disregarded their due-process rights. First, they argue that the juvenile court deprived them of the custody of their children without requiring clear and convincing evidence of the children’s dependency. Because we have already concluded that the juvenile court’s dependency determinations are supported by sufficient evidence, we reject this argument.
Next, the mother and the father argue that the juvenile court violated the father’s due-process rights by failing to appoint counsel to represent the father at the shelter-care hearing. However, an indigent parent does not have a constitutional right to the appointment of an attorney in a dependency proceeding. See T.L. v. W.C.L., 208 So.3d 66 (Ala.Civ.App.2016). Section 12-15-308(c), Ala.Code 1975, provides, in pertinent part, that, “[a]t the commencement of the 72-hour hearing requirement, the juvenile court shall advise the parent, legal guardian, or legal custodian of the right to counsel and shall appoint counsel if the juvenile court determines he or she is indigent.” Section 12—15—308(c) creates a statutory duty on the part of a juvenile court to inform a parent at a shelter-care hearing of his or her right to counsel and to affirmatively investigate the ability of the parent to afford counsel if the circumstances indicate that the parent might be indigent. See generally J.S. v. J.C., 181 So.3d 1067 (Ala.Civ.App.2015).
In these cases, the juvenile court appointed counsel for the mother at the shelter-care hearing based on its determination that she was indigent. Because the father resided with the mother, the circumstances required the juvenile court to inquire into the financial condition of the father and to appoint counsel for the father if he was found to be indigent. The March 11, 2015, shelter-care order indicates that the juvenile court advised the parties of “their rights and the procedures to be followed.” The record does not contain a transcript of the shelter-care proceeding, so the record does not affirmatively show that the juvenile court failed or refused to perform its statutory duty. See Walnut Equip. Leasing Co. v. Graham, 532 So.2d 655, 655 (Ala.Civ.App.1988) (“A party who complains of error by the trial court must affirmatively show from the record on appeal that such error was in fact committed.”); see also Rule 28(a)(5), Ala. R.App. P. (requiring appellant in civil *1236 cases to “identify the adverse ruling or rulings from which the appeal is taken and asserted as error on appeal, with a reference to the pages of the record on appeal at which the adverse ruling or rulings can be found”).
The mother and the father next argue that the juvenile court violated their constitutional rights by maintaining the children in shelter care without taking any evidence. In its March 11, 2015, shelter-care order, the juvenile court indicated that it was maintaining the children in shelter care based on an agreement of the parties. The order states, in pertinent part:
“After advising the parties of their rights and the procedures to be followed, the Court was advised an agreement was reached with the mother, a partial agreement with the father, but the father wanted to make a statement to the court. The Court allowed [the father] to make his statement which was that he agreed to shelter care for his children for a very short duration, but wanted a hearing date set earlier than the customary 60 to 90 days after the shelter care. The Court advised that hearings were based on the Court’s extremely busy docket, but consideration to an earlier date would be given.”
The order shows that the parties waived their right to the evidentiary hearing ordinarily required by Ala.Code 1975, § 12-15-128, and stipulated to the continuation of shelter care. That stipulation was not transcribed, but neither Rule 24(B), Ala. R. Juv. P., nor L.F. v. Cullman County Department of Human Resources, 175 So.3d 183 (Ala.Civ.App.2015), cited by the mother and the father, require such transcription. The March 11, 2015, shelter-care order indicates that the stipulation was made in open court so as to be binding on the parties pursuant to Rule 47, Ala. R.App. P.; see also K.D. v. Jefferson Cty. Dep’t of Human Res., 88 So.3d 893, 896 (Ala.Civ.App.2012) (juvenile court may adjudicate child as dependent based solely on stipulation). Accordingly, the mother and the father cannot now complain that they were deprived of their right to testify and to cross-examine witnesses for the state. See Wood v. State Pers. Bd., 705 So.2d 413, 422 (Ala.Civ.App.1997) (party who waived due-process rights by actions at trial could not raise alleged deprivation of those rights as error on appeal).
The mother and the father last argue that they were deprived of their right to a speedy trial, pursuant to Rule 23, Ala. R. Juv. P. Rule 23(A), Ala. R. Juv. P., provides, in pertinent part, that “[a]n adjudicatory hearing in a delinquency, dependency, or child-in-need-of-supervision case in the juvenile court shall be scheduled for the earliest practicable date.” At the dependency hearing, the juvenile court stated that the hearing in the present cases had been expedited. The record contains no evidence indicating that the hearing could have been held earlier than September 29, 2015. The mother and the father have failed to cite any authority indicating that a violation of due process has occurred or that failing to hold the hearing sooner warrants reversal of the judgment. “[I]t is not the function of [an appellate] court to do a party’s legal research.” Spradlin v. Spradlin, 601 So.2d 76, 78 (Ala.1992). The mother and the father have failed to demonstrate that the juvenile court committed reversible error on this point.
For the foregoing reasons, the judgment of the juvenile court is affirmed.
2150316—AFFIRMED.
2150317—AFFIRMED.
2150318—AFFIRMED.
*1237 THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

. Neither Southern, nor Maynard, nor the father indicated which medications the mother had purportedly abused. The mother testified that she had been prescribed drugs for pain management following her delivery of each of the children. The mother also testified that she was on approximately four medications for her blood pressure at the time of the final hearing and that those medications had changed approximately five times in the past. Reports filed by DHR with the juvenile court indicate that the mother had been prescribed Ambien, Valium, and Zanaflex for issues related to depression and sleep deprivation, as well as blood-pressure medications.