DONALDSON, Judge.
J.P. ("the father") appeals from a judgment of the Jefferson Juvenile Court, Bessemer Division ("the juvenile court"), finding the father's child, Ja.P. ("the minor child"), to be dependent, removing the minor child from the father's custody, and vesting custody of the minor child in M.P. ("the maternal aunt"). Before the father's fundamental constitutional right to the custody of the minor child could be deprived and transferred to a non-parent in these circumstances, the juvenile court must have been presented with clear and convincing evidence that the minor child was dependent. The evidence presented at the hearing held in this case does not support a finding that the minor child was dependent. Therefore, the juvenile court's judgment is due to be reversed and the cause remanded for further proceedings consistent with this opinion.
Facts and Procedural History
The maternal aunt and her husband, D.P. ("the maternal uncle") filed a petition in the Birmingham Division of the Jefferson Juvenile Court on August 15, 2016, seeking to have the minor child declared to be dependent. On September 20, 2016, the maternal aunt and uncle filed an amended petition. On October 5, 2016, the petition was transferred to the Bessemer Division of the Jefferson Juvenile Court because the father and the minor child resided there. A final hearing was held on February 27, 2017.
Testimony from the final hearing revealed the following pertinent facts. The father and the mother of the minor child had been married and had three children of the marriage: the minor child, age 10; a son who was approximately 19 years of age; and an older daughter, K.P., who was approximately 24 years of age. The testimony established that the father and the mother separated approximately 5 to 6 years before the filing of the dependency petition and that the minor child had lived with the mother after the separation. At the time of the hearing, the mother was deceased, allegedly as a result of acts by the son. Although it is not entirely clear from the record, it appears the mother died in 2016 shortly before the filing of the dependency petition. Immediately following the mother's death, the minor child spent one week with the maternal aunt and uncle. After that week, the father assumed custody of the minor child and moved the minor child to his residence. The father had been residing with his mother before the initiation of the dependency proceedings. At the time of the hearing, the minor child had been in the custody of the father since August 2016.
*865 At the February 27, 2017, hearing, the juvenile court conducted an in camera examination of the minor child in which the attorneys for the parties were present. The minor child testified that she wished to live with the father but still be allowed visitation with the maternal aunt. The minor child stated that she, the father, the father's mother, the father's girlfriend, and the girlfriend's sons reside in the house where she lived. The minor child stated that the father's girlfriend resides in the house every day. The minor child stated that, although the father does get angry and scream, he will calm himself down. The minor child stated that, when the father screams, it is directed at the girlfriend's sons. The minor child testified that the father's girlfriend sleeps in one room with her sons and that she and the father share a bed in another room. The minor child testified that the father wakes her up in the mornings, prepares her breakfast, and prepares a lunch on the days she does not eat lunch at school. The minor child stated that she feels there is enough food to eat in the home and that she is provided an adequate amount of clothing to wear. The minor child testified that she felt safe at both the father's mother's home and the maternal aunt's home. The minor child stated that she wished to live with the father. When the minor child's guardian ad litem asked the minor child about a previous statement she had made indicating that she wished to live at the maternal aunt's home and why she had changed her mind, the minor child stated that she liked that there were other children to play with at the father's home and that there were not other children to play with outside at the maternal aunt's home.
The maternal aunt testified that she and the maternal uncle live in Alabaster and had been married for 13 years. The maternal aunt testified that they lived in a three-bedroom, two-bathroom house with a backyard. The maternal aunt testified that K.P. (the father's oldest child) lives with her and the maternal uncle. The maternal aunt testified that she was close with the minor child and had spent a significant amount of time with the minor child and the minor child's mother.
The maternal aunt testified that she believed the father to be angry and violent. The maternal aunt testified that she had seen the father punch walls, "tear furniture," and break a table; however, those incidents occurred approximately 15 years before the hearing. The maternal aunt testified that, several years before the hearing, she had also observed the father become physical with the mother and the son. The maternal aunt testified that she last witnessed an outburst of anger from the father in August 2016, after the death of the mother. The maternal aunt testified that the anger outburst did not result in the father's becoming physical with anyone present and was not directed at the minor child. The maternal aunt offered no testimony indicating that the father had ever abused the minor child. The maternal aunt also testified, over objection, that the mother had sought a protection-from-abuse order against the father at an unspecified time in the past. No evidence was provided regarding the details of any allegations the mother made when seeking a protection-from-abuse order or whether such an order was entered.
The maternal aunt testified that she was worried that the father would not be able to provide a stable home for the minor child or to transport the minor child to receive medical care and "things like that." The maternal aunt testified that the father had not had a steady income or a stable residence in the time that she had known him. The maternal aunt testified that the father has neither a reliable mode of transportation nor a driver's license. The maternal aunt testified that she had not seen the *866 condition of the home where the father and the minor child were residing.
The maternal aunt testified that the father had not provided the primary care for his children while the mother was alive but that the father had visited the children often after the mother and the father separated. The maternal aunt testified that she continued to see the minor child after filing the dependency petition. The maternal aunt testified that the father knew that K.P. was bringing the minor child to the maternal aunt's home to visit. The maternal aunt also testified that she had visited with the minor child at her residence during the Thanksgiving and Christmas holidays in 2016. When questioned by the guardian ad litem, the maternal aunt testified, over objection from the father's counsel, that she was concerned about the mental health of the father and the father's mother and had been told that they each had a mental illness. No evidence was presented regarding the mental-health diagnosis of the father or the father's mother, nor was any evidence presented regarding the effect their mental health had on the minor child. The maternal aunt testified that she had offered to take the minor child to counseling following the mother's death, but had not been allowed to do so. No other evidence concerning the minor child's mental health was presented.
K.P., the older daughter, testified that she remained close with the minor child and saw her on the weekends. K.P. testified that, after the mother and the father separated, she did not see the father often. K.P. testified, however, that the father had seen the minor child approximately every other weekend after the separation. K.P. stated that, while she was living with the father and the mother, prior to the separation five to six years before the hearing, the father was frequently angry at the son and would become physically violent with the son. K.P. did not state how old the son was when these alleged actions occurred. K.P. testified that she once observed the father strike the minor child while the minor child was in a car seat and that that incident had occurred approximately eight years before the hearing. K.P. stated that the minor child was "really small" at the time. K.P. did not testify regarding any other details surrounding that incident. K.P. said that she had not witnessed the father striking the minor child since that time. K.P. stated that the police had been called to the home of the mother and the father multiple times during her childhood. K.P. stated that the last time she observed any altercation or "violence" from the father was approximately five years before the hearing. K.P.'s interaction with the father had been limited in the five years before the hearing.
K.P. testified about her routine when picking up the minor child for weekend visits after the mother's death. K.P. stated that, when she dropped the minor child off at the father's home, she would watch the minor child let herself into the home. K.P. testified that, because she did not speak to the father, she would not notify him of when she was dropping off the minor child. K.P. stated that there was one time when no one was present when she attempted to drop off the minor child at the father's home and that she waited with the minor child outside the home until someone arrived. K.P. testified that, in her opinion, the father could not provide the necessities that the minor child needed and that the minor child was in danger when in the father's care. K.P. also stated that the father drinks when he is around the minor child and that he is "always at the bar and clubs." K.P. stated that she had not been inside the father's home since December 2016, and she did not testify regarding the condition of the home.
*867 K.P. testified that she also believed the father to have a mental illness but did not provide any other information about what type of illness or any effect the alleged illness had on the minor child. K.P. also stated that the father's mother had spent time on the psychiatric floor of a hospital when K.P. was very young, but, again, she could not offer any other evidence about that allegation.
The father testified that, during his separation from the mother, he continued to support the minor child. The father testified that he gave the mother $150 every two weeks when he would see the minor child. The father testified that he exercised visitation with the minor child when he wanted to but would allow the minor child to visit with friends in lieu of visitation with him if the minor child so desired.
The father testified that he had taken the minor child to one counseling session after the mother's death but that he did not continue the counseling sessions for the minor child due to legal fees associated with this case. The father stated that the minor child has been seeing a counselor at her school and that he intends to resume counseling for the minor child after the conclusion of this case. The father also testified that the minor child was no longer participating in dance classes due to costs he had incurred defending against the dependency petition. He later stated that he did, however, enroll the minor child in cheerleading and paid the associated fees and costs.
The father testified that, since the minor child has been living with him, he disciplines her as necessary by taking her cellular telephone or restricting her television privileges. The father stated that he could not physically discipline the minor child because "she won't let [him]" and that, when he "fuss[es] at her, she'll just start crying and [he] just can't." The father testified that he helps the minor child with her homework and that she is on the "A/B honor roll" at school. The father stated that he, his girlfriend, and his mother share in transporting the minor child to and from school. The father admitted to not having a driver's license yet still operating an automobile on occasion to drive the minor child. The father stated that he is eligible to have his license reinstated upon purchasing new eyeglasses and paying a $77 fee. The father testified that, in the time she has been living with him, he has taken the minor child to the doctor and that he intended to have her see an orthodontist for braces. The father stated that the minor child is insured through either Medicaid or AllKids Insurance. The father also stated that the minor child has had friends from school come to his home to spend the night and that she has many friends at her school. The father testified that he does not consume alcohol around the minor child and that he does not keep alcohol in the home.
The father testified that, before the minor child came to live with him, he had been working at "FSI."[1] The father had worked there for three years, until "FSI" ceased operations. The father then began working for Supreme Automotive, an automobile-repair business. The father stated that he earned $350 per week and that he works 30 hours per week. The father testified that he does not work full-time so that he can be off work when the minor child gets out of school each day.
The father was questioned about answers he gave during a Department of Human Resources ("DHR") interview in January 2017. The father reported to the DHR representative that his monthly income was $3,079 per month. At the hearing, the father clarified, stating that that *868 figure included "everybody['s] money." The father stated that any amount over his weekly compensation came from his mother's income, $250 in food stamps, and a $958 check the minor child receives every month. The father testified that he uses the money the child receives to provide for her needs and pay bills. The father testified that there is a mortgage on the home that is owned by his mother. The father stated that he pays his mother $300 per month toward the mortgage and pays the remainder of the household bills, which include power, gas, and Internet and cable service. The father also testified that he pays for a cellular telephone for himself and for the minor child.
The father testified that his girlfriend spends the night at his residence on occasion. The father stated that the girlfriend's sons will also, on occasion, spend the night at his residence. The father stated that his girlfriend has her own residence where she and her sons reside.
The father denied ever physically abusing the mother or the son. The father admitted to punching a hole in a wall when the son was two years old. The father stated that, while he had lived with the mother, he had shoved the son two or three times when the son balled his fists at the father, presumably to fight. The father admitted that K.P. was present during the last altercation between him and the son, which occurred eight years before the hearing. The father testified that the police had been called to the home he and the mother shared on 1 occasion, approximately 20 years before the hearing. When asked about the protection-from-abuse petition filed by the mother, the father stated that they had not gone to court and had continued to reside together after its filing. The father testified that he had physically disciplined, or "spanked," K.P. when she was five years old. The father stated that he had never struck or physically disciplined the minor child. The father testified that, when he and the mother separated, he helped the mother move into the maternal aunt's home. After that, he stated, he had lived with either his girlfriend or at his mother's residence where he had resided for the last two years.
Although the father admitted that he had been arrested for possession of a controlled substance 10 years before the hearing, there was no testimony about the disposition of that arrest. The father stated that he never used illegal drugs.
The father's mother testified that she, the father, and the minor child lived in her home. The father's mother testified that she pays the mortgage on the home while the father pays the expenses for utilities. She testified that the father financially supports the minor child by buying items that she needs such as clothes and groceries. The father's mother testified that she had never seen the father physically abuse the minor child or his other children. The father's mother testified that the interactions she had witnessed between the father and the minor child were positive. She stated that the father and the minor child played together, that the father cooked for her and cleaned her clothes, and that he did other activities with her. The father's mother testified that the father's girlfriend would spend the night at her home about three times per week. The father's mother stated that, when the girlfriend spent the night at her home, the girlfriend would stay in a room by herself and the father would stay in the bedroom with the minor child. When asked by the juvenile court whether or not she approved of the minor child's sharing a bed with the father, the father's mother stated that she did not oppose the sleeping arrangement. The father's mother denied that she or the father had ever been diagnosed with a mental *869 illness or been under the care of a psychiatrist or psychologist.
On March 6, 2017, the juvenile court entered a final judgment that stated, in pertinent part:
"The minor child has lived with the maternal aunt and now resides with her father. That the father is not capable of providing the minor with the proper care that [the minor child] needs. Testimony provided that the father has never had a residence of his own. That [the father] currently lives with his mother in a 3 bedroom home. There was testimony that the father's girlfriend also resides in the home.
"Furthermore, other testimony showed that the father and the minor child share a bed together and that the father's girlfriend and her two (2) teenage sons share a bedroom with her. That the father has been bouncing from job to job, since his primary job at FSI closed down. The father is currently working at Supreme Automotive where he brings home $350.00 (cash) weekly.
"Testimony at trial showed that the father has not held a driver's license for some 20 plus years, but he continues to drive and at times drives the minor child around. There was testimony that the mother filed a [protection-from-abuse petition] against the father. There was testimony from the maternal aunt and [the child's] older sister that the father has a violent temper and anger issues. Although his mother and aunt testify that he is not overly angry and they have never witnessed him being violent.
"This case does not involve a mere custody dispute between a parent and nonparent, but what is in the best interest of the minor child.
"The [juvenile] court has grave concerns, in this day and age regarding the sleeping arrangements of the father and his 10 year old daughter and that of the girlfriend and her sons. That a middle age man sleeps in the same bed with his younger daughter. Although his mother did not feel that this was a problem, but, she felt that the girlfriend sleeping with her two sons wasn't right. The [juvenile] court believes that other sleeping arrangements should have been made.
"....
"1. Wherefore, the [juvenile] [c]ourt from clear and convincing evidence and having considered all relevant and material evidence presented, FINDS [the minor child] to be DEPENDENT and IN NEED OF CARE AND SUPERVISION pursuant to Ala. Code § 12-15-102(8) a.
"2. THAT CUSTODY OF [the minor child] is vested in the maternal aunt ....
"3. The court does not desire to move the minor child in the middle of the school semester and seeing that the school year will end in approximately two (2) months. The minor needs to remain enrolled in her current school, therefore either the aunt will transport daily or the minor will continue to reside in the paternal grandmother's residence until the school year ends. If the child needs to remain in [the father's mother's] residence THE SLEEPING ARRANGEMENTS BETWEEN THE FATHER AND DAUGHTER NEED TO BE CHANGED ASAP."
(Capitalization in original.) On March 10, 2017, the father filed a motion to alter, amend, or vacate the juvenile court's judgment. In his postjudgment motion, the father contended, among other things, that the juvenile court's judgment was contrary to the weight of the testimony and evidence presented and contrary to Alabama law. The maternal aunt and uncle filed a response to the father's postjudgment motion denying the assertions therein. On March 21, 2017, the juvenile court held a *870 hearing on the father's postjudgment motion at which no additional testimony was taken. On that same day, the juvenile court entered an order denying the father's postjudgment motion. The father timely filed his notice of appeal on March 28, 2017. This court has jurisdiction pursuant to § 12-15-601, Ala. Code 1975, and Rule 28(a)(2), Ala. R. Juv. P. The maternal aunt and uncle[2] did not file a brief on appeal.
Standard of Review
" 'On appeal from a judgment finding a child dependent following an ore tenus proceeding, we presume the juvenile court's factual findings are correct. J.W. v. C.H., 963 So.2d 114, 119 (Ala. Civ. App. 2007). Those findings will not be disturbed if they are supported by sufficient evidence. Ex parte Floyd, 550 So.2d 982, 984 (Ala. 1989). In passing on the question of the sufficiency of the evidence as to a finding of dependency, this court does not reweigh the evidence; instead, this court determines whether the juvenile court, acting in its fact-finding role, reasonably could have determined from its own weighing of the evidence that the dependency of the child was proven by clear and convincing evidence .... J.B. v. DeKalb County Dep't of Human Res., 12 So.3d 100, 112 (Ala. Civ. App. 2008).'
" R.F.W. v. Cleburne Cty. Dep't of Human Res., 70 So.3d 1270, 1272 (Ala. Civ. App. 2011)."
N.G. v. Blount Cty. Dep't of Human Res., 216 So.3d 1227, 1233 (Ala. Civ. App. 2016).
Discussion
The father contends that the juvenile court was not presented with clear and convincing evidence that the minor child is dependent and that, therefore, the juvenile court could not remove the minor child from his custody.[3] See § 12-15-311(a), Ala. Code 1975 (requiring clear and convincing evidence to establish that a child is dependent). Pursuant to § 12-15-102(8), Ala. Code 1975, a part of the Alabama Juvenile Justice Act ("the AJJA"), § 12-15-101 et seq., Ala. Code 1975, a "dependent child" is
"a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in subdivision (2) of Section 12-15-301, [Ala. Code 1975,] or neglect as defined in subdivision (4) of Section 12-15-301, or allows the child to be so subjected.
"2. Who is without a parent, legal guardian or legal custodian willing and able to provide for the care, support, or education of the child.
"3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.
"4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state.
*871 "5. Whose parent, legal guardian, legal custodian or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.
"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.
"7. Who has been placed for care or adoption in violation of the law.
"8. Who, for any other cause, is in need of the care and protection of the state."
" 'Clear and convincing evidence' is " '[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." ' " C.O. v. Jefferson Cty. Dep't of Human Res., 206 So.3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ. App. 2002), quoting in turn § 6-11-20(b)(4), Ala. Code 1975 ). In a dependency proceeding, the evidence must clearly and convincingly establish that the child is dependent at the time of the disposition. See R.F.W., 70 So.3d at 1272.
"In determining whether a child is dependent, the juvenile court
" 'may consider any competent evidence relevant to the ability or willingness of the parent to discharge his or her responsibilities to the child, including, but not limited to, evidence of: domestic violence, see, e.g., A.W.G. v. Jefferson County Dep't of Human Res., 861 So.2d 400 (Ala. Civ. App. 2003), and B.D.S. v. Calhoun County Dep't of Human Res., 881 So.2d 1042 (Ala. Civ. App. 2003) ; [and] parental conduct toward other children, see, e.g., D.A. v. Calhoun County Dep't of Human Res., 892 So.2d 963 (Ala. Civ. App. 2004)....' "
J.L. v. W.E., 64 So.3d 631, 636 (Ala. Civ. App. 2010) (quoting M.E. v. Shelby Cty. Dep't of Human Res., 972 So.2d 89, 100-01 (Ala. Civ. App. 2007) ).
Although the juvenile court did not cite which subsection of § 12-15-102(8) a. it relied on to establish the dependency of the minor child, the juvenile court stated in its judgment "[t]hat the father is not capable of providing [the minor child] with the proper care that she needs." See § 12-15-102(8) a.2 and 6. At time of the hearing, the minor child had been living with the father in the same household for approximately six months. The minor child stated that she felt safe in the father's home and had adequate food. The record shows that the father cleaned the minor child's clothes, cooked her meals, and assisted her with school assignments. The evidence showed that the child was attending school and was on the "A/B honor roll." The record further reveals that the father was active in the minor child's school activities and that the school had voiced no complaints about the minor child or the father when contacted by the guardian ad litem.
There was no evidence presented tending to show that the father's residence is in such a condition that it would present a danger to the minor child. There was testimony at the hearing alleging that both the father and the father's mother had an unspecified mental illness. Both the father and the father's mother denied that they had any mental illness, and the record does not disclose a diagnosis for the father or the father's mother. The allegation of an unspecified mental illness does not clearly and convincingly show that the father is unable or unwilling to care for the minor child.
The juvenile court found that the father has "been bouncing from job to job" since ceasing to work at "FSI." From the record, the undisputed testimony is that the *872 father has had only one employer, Supreme Automotive, since the time he stopped working at "FSI." The undisputed evidence showed that he has maintained that job. No other evidence appears in the record to indicate that the father had several different employments. The father testified that he uses the income he receives to provide for the necessities for the minor child.
The record reveals that the minor child had health insurance and that the father had taken the child to at least one doctor's appointment since the minor child had been in his custody. The father testified that he intended to take the child to an orthodontist for braces. The record lacks any evidence indicating that the father was not providing appropriate medical care necessary for the health or well-being of the minor child. The father testified that he had not been able to afford more counseling sessions for the minor child because of the fees associated with the dependency litigation initiated by the maternal aunt and uncle, but, he said, he intended to resume counseling for the minor child when the litigation ended. He also testified that the minor child was seeing a school counselor. We do not find clear and convincing evidence in the record to show that a lack of counseling caused the minor child to be deprived of medical necessities on these facts. See § 12-15-102(8) a.3.
There was disputed testimony that the father had physical altercations with his son and an allegation that he had struck the minor child some eight years before the hearing. The juvenile court found that the mother had, at an unspecified time in the past, filed a protection-from-abuse petition against the father. There is no evidence in the record regarding the disposition of that protection-from-abuse petition. The father testified that the parties did not go to court regarding that petition and that he and the mother continued to reside together afterward.
We also note that many allegations regarding the father's conduct involved incidents that had occurred years before the proceedings. Although the father's past conduct was properly considered by the juvenile court, see Ex parte Berryhill, 410 So.2d 416 (Ala. 1982), his past conduct must be relevant to conditions that would cause the child to be dependent at the time of the disposition. See R.F.W, 70 So.3d at 1272. Evidence of a parent's past conduct is admissible if it assists the juvenile court in assessing and weighing the evidence regarding current conditions, but evidence of past conditions cannot be the sole basis for finding a child to be dependent. See, e.g., M.G. v. Etowah Cty. Dep't of Human Res., 26 So.3d 436, 442 (Ala. Civ. App. 2009) (citing V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala. Civ. App. 1998) ) (noting that, in a termination-of-parental-rights case, evidence of a parent's past conduct or family history must be shown to have an impact on current conditions). There was no evidence to support a finding that the minor child was currently subjected to an environment that caused her to be dependent based on domestic violence. In fact, the juvenile court's decision to permit the child to remain in the custody of the father for the remainder of the school year and to have unsupervised visitation with the father thereafter is wholly inconsistent with a finding that the child was dependent based on domestic violence.[4]
*873 The juvenile court also found that the father has never owned a residence of his own. The evidence in the record shows that the father has, at times, lived with his girlfriend, but has considered his mother's residence his home. The evidence at trial showed that the father had resided in the same home for two years preceding the hearing. The father's mother testified that she considered her home to be the father's home and the minor child's home as well. The evidence at trial did not show by clear and convincing evidence that the father was unable or unwilling to provide adequate shelter and care for the minor child. Although the evidence was conflicting regarding the frequency of the girlfriend's presence, there was no evidence introduced at trial to show that the father's girlfriend's presence caused the minor child to be dependent. See L.A.C. v. T.S.C., 8 So.3d 322, 328 (Ala. Civ. App. 2008) (finding that the mother's cohabitation with a married man, while not favorable, did not support a finding of dependency).
In the judgment finding the child to be dependent, the juvenile court noted the sleeping arrangements of the father and the minor child when the father's girlfriend was present. There was conflicting testimony regarding the frequency of the overnight visits by the father's girlfriend, and the resolution of that conflicting testimony was for the juvenile court to determine. The juvenile court justifiably believed that the father should not share a bed with the minor child at any time, and this court shares the juvenile court's concerns. There was no other evidence presented, however, regarding the sleeping arrangements. We note again that, after finding the child to be dependent, the juvenile court permitted the child to remain in the father's home until the end of the school year and granted unsupervised visitation thereafter. We recognize that, after a finding of dependency, the juvenile court may "[p]ermit the child to remain with the parent ..., subject to conditions and limitations as the juvenile court may prescribe," § 12-15-314(a)(1), Ala. Code 1975. The only condition that the juvenile court placed on the minor child's remaining with the father until the end of the school year was that the father make other sleeping arrangements, indicating that the father could provide the minor child with a safe environment for the child to continue in an acceptable school environment. We are unable to determine from this record how this evidence clearly and convincingly established the dependency of the minor child under any of the subsections of § 12-15-102(8) a.
There is no evidence in the record that suggests that the minor child or other children in the home in which the father currently resides were being subjected to abuse or neglect at the time of the hearing. See § 12-15-102(8) a.1; § 12-15-301(2) (defining "abuse" as "[h]arm or the risk of harm to the emotional, physical health, or welfare of a child"); and § 12-15-301(8) (defining "neglect" as "[n]egligent treatment or maltreatment of a child, including, but not limited to, the failure to provide adequate food, medical treatment, supervision, education, clothing, or shelter"). There was no evidence showing that the father failed, refused, or neglected to comply with the state's compulsory school attendance laws. See § 12-15-102(8) a.4.
*874 Nor does the record support a finding that the father had abandoned the minor child before the mother's death. Section 12-15-301(1), defines "abandonment" as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
The maternal aunt testified that the father saw the minor child often before the mother's death. K.P. also testified that the father continued to see the minor child after the father's and the mother's separation. K.P. stated that the father continued to see the minor child two weekends per month, and occasionally spent the night with the minor child, until the mother's death. Such frequent contact between the minor child and the father before the mother's death cannot be said to constitute abandonment. See § 12-15-102(8) a.5.
As reflected in the March 6, 2017, judgment, the juvenile court attempted to act in the best interest of the minor child in transferring custody to the maternal aunt. The record supports a finding that the maternal aunt would be able to provide a nurturing environment for the minor child. If the sole question presented to the juvenile court was whether the best interest of the minor child would be served by transferring custody, the evidence would fully support the judgment.[5] But before determining the best custodial environment and removing the minor child from the father's custody, the evidence must have clearly and convincingly established the dependency of the minor child. The state, acting through the judicial branch, cannot move a child from a parent to a more preferable environment, no matter how well-intentioned, without such a determination.
" 'As a matter of constitutional law, a parent who has exercised custody over a child has a prima facie right to the continued custody of the child. See In re Moore, 470 So.2d 1269, 1270 (Ala. Civ. App. 1985). The presumptive right of parents to the custody of their child may be overcome by clear and convincing evidence demonstrating that the parents are currently unable to discharge their responsibilities to and for the child and that the child requires additional care and supervision through the state, i.e., that the child is "dependent." See Ala. Code 1975, § 12-15-102(8) a.6; see also V.W. v. G.W., 990 So.2d 414, 417 (Ala. Civ. App. 2008) (quoting K.B. v. Cleburne County Dep't of Human Res., 897 So.2d 379, 389 (Ala. Civ. App. 2004) (Murdock, J., concurring in the result) ) ....' "
N.G. v. Blount Cty. Dep't of Human Res., 216 So.3d 1227, 1233 (Ala. Civ. App. 2016) (quoting R.F.W. v. Cleburne Cty. Dep't of Human Res., 70 So.3d 1270, 1272 (Ala. Civ. App. 2011) ). There was insufficient evidence presented at the hearing to find that the father was " 'currently unable to discharge [his] responsibilities to and for the [minor] child and that the [minor] child requires additional care and supervision through the state.' " Id. Therefore, the juvenile court could not remove the minor child from the custody of her father.
*875 The father also raises as an issue in his brief the failure of the juvenile court to state a reason for the denial of his March 29, 2017, motion filed in the juvenile court seeking approval to proceed on appeal in forma pauperis. In the motion, the father's attorney stated that the juvenile court had previously found the father to be "partially indigent" and had appointed the attorney to represent the father in the proceedings. The motion requested an order "allowing him to proceed in the Alabama Court of Civil Appeals in forma pauperis." On March 31, 2017, the juvenile court entered an order denying the motion without an explanation. In his brief to this court filed on October 25, 2017, the father argued that "[t]he [juvenile] court erred in denying the motion and erred in failing to state the reasons for said denial." As a result, the father argues that he "should be allowed to proceed with appointed counsel in this appeal."
Although we agree that Rule 24(a), Ala. R. App. P., requires a "the trial court [to] state in writing the reasons for the denial" of a request to proceed on appeal in forma pauperis, the rule also requires that a motion must be filed in the appellate court within a specific time to review the denial:
"If a motion for leave to proceed on appeal in forma pauperis is denied by the trial court, ...the clerk shall forthwith serve notice of such action. A motion for leave so to proceed may be filed in the appellate court within 28 days (4 weeks) after service of notice of the action of the trial court. The motion shall be accompanied by a copy of the affidavit filed in the trial court, or by the affidavit prescribed by the first paragraph of this subdivision if no affidavit has been filed in the trial court, and by a copy of the statement of reasons given by the trial court for its action."
A motion to proceed in forma pauperis was not filed in this court within 28 days of the entry of the March 31, 2017, order of the trial court, and we are not directed to authority that would permit this court to grant relief from the denial of the March 29, 2017, motion at this point of the appellate proceedings.[6]
Because the record does not show clear and convincing evidence supporting the juvenile court's finding that the minor child is dependent, the judgment must be reversed and the cause remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Thompson, P.J., and Pittman, J., concur.
Moore, J., concurs in the result, without writing.
Thomas, J., dissents, with writing.

Although it is unclear from the record, "FSI" appears to be a manufacturing plant.

Although the final judgment grants custody of the child to the maternal aunt and not the maternal uncle, the maternal uncle was a petitioner seeking to have the child declared to be dependent and was a party throughout the proceedings in the juvenile court.

The father raises other issues on appeal, including challenges to several evidentiary rulings of the juvenile court. Because this issue is dispositive of the father's appeal, we pretermit discussion of the other issues the father raises in his principal brief.

Section 30-3-131, Ala. Code 1975, creates a rebuttable presumption that a perpetrator of domestic violence should not have custody of a child "where there is at issue a dispute as to the custody of a child." The threshold issue in this case is not who should have custody of the minor child, but whether the minor child is dependent, and there is no dispute over the custody of this child without a finding of dependency. To the extent § 30-3-131 has any application to the determination of whether the minor child is dependent, the juvenile court allowed the minor child to remain in the custody of the father to finish the school year and to have unsupervised visitation with the father thereafter. See § 30-3-135, Ala. Code 1975 (providing for limitations on visitation with a parent who has committed domestic violence). Those orders are inconsistent with a finding that domestic violence caused the minor child to be dependent.

The concurring opinion in T.G.F. v. D.L.F., 237 So.3d 216 (Ala. Civ. App. 2017), does not address the issue of whether clear and convincing evidence was presented to deprive a parent of a fundamental constitutional right. In this case, the juvenile court was not asked to decide which parent should have custody of a child, but, rather, was asked to remove a minor child from the custody of her father and to transfer custody to a nonparent.

We also note that under Rule 24(a), "a party who has been permitted to proceed in an action in the court in forma pauperis ... may proceed on appeal in forma pauperis without further authorization unless" the trial court orders otherwise.