Rel: February 21, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0202

_____

### E.W.

### v.

### D.H. and N.S.

### Appeal from Limestone Juvenile Court
### (JU-21-88.04)

HANSON, Judge.

E.W. ("the mother") appeals from a judgment of the Limestone Juvenile Court finding her child, C.N.H. ("the child"), dependent and placing the child into the custody of D.H. ("the paternal grandfather") and N.S., his wife.

## Facts and Procedural History

We set forth the following facts and history from a previous appeal involving these parties and this child, <u>E.W. v. Limestone County Department of Human Resources</u>, 390 So. 3d 1103 (Ala. Civ. App. 2023):

"The child was born in April 2020. The mother and P.H., the child's father, were never married. The Limestone County Department of Human Resources ('DHR') became involved with the parents and this child following a report made on March 1, 2021, alleging that there had been domestic-violence episodes, that the child's medication for a current illness was not being properly administered by the parents, that the house the parents and the child were living in was inadequate and unclean, and that the parents were not properly supervising the child.

"On March 12, 2021, a safety plan was implemented by DHR whereby the paternal grandfather, N.S., and the paternal grandfather's daughter, J.C., would temporarily care for the child. While the safety plan was being implemented, a social worker with DHR observed the father outside his house hitting and throwing things. The paternal grandfather had to request the assistance of law-enforcement officers to remove the father from the parental grandfather's house following an incident where the father squeezed the child until the child cried and began yelling at the child.

### Procedural History

"On April 16, 2021, DHR filed a dependency petition alleging that the child was dependent pursuant to § 12-15-102(8)a.1, 6, and 8, Ala. Code 1975. On April 19, 2021, the juvenile court set the initial appearance hearing for May 14, 2021. The juvenile court appointed a guardian ad litem for the child. On May 26, 2021, following a hearing, the juvenile court

2

entered an order awarding temporary custody of the child to the paternal grandfather and N.S. The juvenile court scheduled a dependency adjudicatory hearing for July 9, 2021, which was rescheduled. On August 2, 2021, the juvenile court appointed Austin Pike, a supervisor for the Court-Appointed Special Advocate ('CASA') program, as representative for the child.

"On August 6, 2021, N.S. and the paternal grandfather filed a handwritten motion seeking to intervene in the case. The juvenile court entered an order setting the motion to intervene for a hearing. On August 20, 2021, the mother filed a response, opposing the motion to intervene. On August 27, 2021, the juvenile court set the dependency petition for a hearing on September 29, 2021.

"On September 15, 2021, N.S., now represented by counsel, filed another motion to intervene. The juvenile court set the motion to intervene for a hearing on September 29, 2021. On September 29, 2021, N.S.'s counsel filed an amended motion to intervene to include the paternal grandfather.

"The juvenile court granted the paternal grandfather and N.S.'s motion to intervene. Following ore tenus proceedings, the juvenile court entered an order on October 12, 2021, finding that the child was dependent pursuant to § 12-15-102(8)a. The juvenile court awarded the mother legal and physical custody of the child. The juvenile court ordered DHR to continue protective services for the family and ordered the mother to participate in parenting classes as well as any other services set out in the individualized service plan ('ISP'). The juvenile court further ordered that the mother have no contact with the father. The juvenile also court ordered that the father have no contact with the mother; that he have supervised visitation with the child; and that he participate in domestic-violence classes, anger-management classes, and any other services recommended by DHR. The juvenile court ordered that the paternal grandfather and N.S.

be allowed meaningful visitation with the child so long as the visitation does not conflict with the father's visitation and that the father not be present for their visitation. On October 12, 2021, the juvenile court also appointed Leah Pierce as a CASA representative for the child.

"On October 12, 2021, the guardian ad litem filed a motion to alter, amend, or vacate the order entered earlier that day, requesting that the juvenile court include a graduated schedule for the transition of the child to the mother's home and that the child remain with the paternal grandfather and N.S. until the transition was complete. On October 14, 2021, the juvenile court denied the guardian ad litem's motion.

"On October 18, 2021, the paternal grandfather and N.S. filed an emergency motion for temporary custody. They alleged that on October 18, 2021 the mother's mother, ('the maternal grandmother') had asked the paternal grandfather and N.S. to take care of the child after the mother had given birth to another child that same day and while she was in the hospital.[1] The paternal grandfather and N.S. alleged that the child was 'covered in bed bug bites,' that the mother had canceled a doctor's appointment for the child, and that the mother had left the child with the maternal grandmother, who, they said, was unable to care for the child. The paternal grandfather and N.S. attached to their motion photographs showing some insect bites on the child.

"That same day, October 18, 2021, the juvenile court entered an order at 11:21 a.m., granting the emergency motion for temporary custody and setting the matter for a hearing on October 19, 2021. Subsequently, on October 18, 2021, the mother filed a response to the emergency motion for temporary custody, stating that the mother had gone to the hospital that morning with excessive bleeding. The mother asserted that the maternal grandmother had contacted the paternal grandfather and N.S. to ask if they would care for

4

the child because the child could not go into the emergency room or the labor and delivery room at the hospital. The mother admitted that she had canceled a doctor's appointment for the child because the appointment was for October 18, 2021, and the mother, due to her emergency, would not be able to take the child to the appointment. The mother denied that the insect bites on the child were due to bedbugs. The mother alleged that the insect bites were on the child when custody had been exchanged on October 12, 2021, following the entry of the juvenile court's order awarding the mother custody. The mother also attached to her response photographs showing some insect bites on the child.

"Following a hearing, the juvenile court, on October 29, 2021, returned legal and physical custody of the child to the mother. The paternal grandfather and N.S. were allowed visitation with the child pursuant to a schedule set out in the order. On November 1, 2021, the paternal grandfather and N.S. filed a motion to amend the visitation schedule to permit them to pickup the child early and possibly return the child late for a particular visit so that they could attend an out-of-town family wedding. On November 2, 2021, the juvenile court entered an order allowing the rescheduling of that visit, with the caveat that the paternal grandfather and N.S. notify the mother of any possible delay, and stating that, if they abused the juvenile court's leniency, they could be held in contempt.

"On December 4, 2021, the guardian ad litem filed a motion for an emergency hearing, alleging that the child was again covered in insect bites that, according to the paternal grandfather and N.S., had been determined to have been caused by bedbugs. The guardian ad litem stated that the CASA had observed insect bites on the child. The guardian ad litem stated that the mother had been taking the child to homes in which the child was being exposed to drug paraphernalia. In support of the motion, the guardian ad litem attached two photographs depicting insect bites on one

5

side of the child's face and on one of the child's legs. The guardian ad litem also attached a photograph of an item purported to be drug paraphernalia that the child had been exposed to. The guardian ad litem did not attach anything to support the paternal grandfather and N.S.'s allegation that the insect bites were caused by bedbugs.

"On December 5, 2021, the juvenile court entered an order setting the requested emergency hearing on December 7, 2021, and ordering that, until the hearing, the child stay with the paternal grandfather and N.S. Subsequently, on December 5, 2021, the mother filed a response to the motion. The mother alleged that the photograph purporting to show drug paraphernalia that the child had been exposed to was a photograph the mother's cousin had taken of the child at their grandfather's home, which the cousin had posted to a social-media account. The mother alleged that the alleged item of drug paraphernalia was a lava lamp that her grandparents had received as a 'Dirty Santa' gift, and the mother attached to her response a photograph that depicts a lava lamp with marijuana leaves on it. The mother admitted that the child had had insect bites that her pediatrician had told her to treat with Benadryl and cortisone. According to the mother, the pediatrician had told her that it was not possible to affirmatively diagnose the insect bites on the child as bedbug bites. The mother attached information from the Centers for Disease Control and Prevention on bedbugs. The mother alleged that, other than the child, neither she nor anyone else in their home had insect bites.

"In her response, the mother stated that she had thought the child could have chicken pox and that she had been told to try and schedule an appointment with her pediatrician on a Monday that was during the paternal grandfather and N.S.'s visitation. According to the mother, N.S. would not swap visitation to allow her to schedule that appointment.

6

"Following a hearing, the juvenile court entered an order on December 7, 2021, transferring temporary legal and physical custody of the child to the paternal grandfather and N.S., with the mother having unsupervised visitation. The juvenile court ordered the mother to take the child to the pediatrician to determine the cause of the child's bites or rashes.

"Following a custody review hearing on December 17, 2021, the juvenile court continued temporary custody of the child with the paternal grandfather and N.S. and continued unsupervised visitation with the mother. The juvenile court ordered that the father's visitation continue to be supervised, with DHR securing a different supervision provider if possible, and awarded the father an additional holiday visit that 'may be supervised' by the paternal grandfather and N.S. on a day that did not conflict with the mother's visitation. The juvenile court ordered the mother to secure and maintain employment and to find stable housing with assistance from DHR. The juvenile court ordered DHR to help the mother secure and pay for child care. The juvenile court ordered the mother to enroll in and complete an eight-week parenting course provided by LifeLinks on Monday evenings, with DHR paying for the course. The mother and the father were both ordered to enroll in drug testing conducted through the Limestone County community corrections program.

"On December 31, 2021, the mother filed a motion to alter, amend, or vacate the December 17, 2021, order. The mother noted that the juvenile court had not heard testimony and had based its decision on arguments from counsel for the parties and certain documents provided by counsel. In her motion, the mother noted that, since the juvenile court had held its adjudicatory hearing regarding the child's dependency on September 29, 2021, and had entered its October 12, 2021, order awarding the mother legal and physical custody of the child, three different motions had been filed in an effort to modify the October 12, 2021, order. The

7

mother stated that both the mother's house and the paternal grandfather's house had been inspected for bedbugs and that none had been found. The mother stated that the child had seen her pediatrician, who had concluded that the child's 'rash' was consistent with unidentified insect bites and had referred the child to an allergist that had previously treated the child. The mother stated that she could find no caselaw holding that the presence of insect bites on a child, alone, were sufficient to remove the child from the parent's custody. The mother also noted that there were no allegations presented at the December 17, 2021, hearing that the mother's house was unclean, that the child was inadequately supervised or inadequately fed, or that the child had been subjected to physical abuse by the mother. In her motion, the mother argued that, although the guardian ad litem's motion had not raised the issue of the mother's housing, the guardian ad litem and DHR's attorney had argued at the December 17, 2021, hearing that the mother's housing was unstable because the mother was not related to the owners of the residence she and the child lived in and, thus she could possibly lose her housing. She notes that she had been in the same residence since July 2021 and that the juvenile court had awarded her legal and physical custody on October 12, 2021.

"In her motion to alter, amend, or vacate the December 17, 2021, order, the mother asked the juvenile court to return custody of the child to her, to allow her to establish housing with a blood relative, and to amend the order to allow her relatives to help her with child care. The mother asserted that she is gainfully employed and that she expects to work 30 hours per week. The mother asked the court to amend the order requiring her to enroll in monthly drug testing conducted through the Limestone community-corrections program to allow her to have drug testing in Madison County. The mother also noted that she has had numerous drug screens since DHR became involved in this case and that she has never tested positive for any drug.

"On January 18, 2022, the juvenile court amended its December 17, 2021, order to require that the mother secure stable housing on her own or with a blood relative and that the mother secure 'appropriate childcare' with assistance from DHR, if needed. Moreover, the juvenile court encouraged DHR to make different drug-testing arrangements if the mother identified a more convenient drug-testing program that DHR could pay for. The juvenile court stated that if DHR is unable to pay for drug testing at a different facility, then the mother would be responsible for paying. The juvenile court denied the mother's request to change temporary custody.

"On January 20, 2022, the mother filed a motion seeking permission from the juvenile court to temporarily move to R.W.'s home in Flintville, Tennessee, which, she said, is six miles from the mother's current residence in New Market, Alabama. R.W. is the mother's father ('the maternal grandfather'). The mother asserted that she would return to Madison County, Alabama, as soon as she could obtain her own housing. The mother also asked for a clarification of the January 18, 2022, amended order regarding whether 'appropriate childcare' included in-home care by a relative. On January 27, 2022, the juvenile court granted the mother permission to relocate. The juvenile court stated that it could not 'define "appropriate childcare" for the mother, though the court has ordered [DHR] to assist the mother in securing "appropriate childcare" if needed. An assessment of her childcare plan will be made at the permanency hearing.'

"On March 16, 2022, the mother filed a motion for change of temporary custody, arguing that she had complied with the juvenile court's orders, and also sought permission to permanently relocate to Flintville, Tennessee. On March 16, 2022, the paternal grandfather and N.S. filed a response. On March 21, 2022, the juvenile court entered an order providing that the relief requested by mother 'is a determination that

must be made by the court after a testimonial permanency hearing.'

"On May 31, 2022, the juvenile court held a permanency hearing on the dependency petition. On June 7, 2022, the juvenile court entered a permanency order finding that the child remained dependent under § 12-15-102(8)a. The juvenile court awarded permanent custody to the paternal grandfather and N.S. The juvenile court ordered that the mother continue to have unsupervised visitation with the child every weekend and additional unsupervised visitation on the first, third, and fifth week of each month beginning on that Thursday. The father was allowed to continue visitation with the child, under supervision of the paternal grandfather and N.S., who the juvenile court expressly authorized to terminate and suspend any visit with the father upon suspicion that he is under the influence of alcohol.[2]

"On June 21, 2022, the mother filed a motion to alter, amend, or vacate the permanency order. That same day, the mother also filed a notice of appeal. On June 22, 2022, the juvenile court entered an order purporting to schedule the motion for a hearing on July 22, 2022, which was outside the time limitations set forth in Rule 1(B), Ala. R. Juv. P. As a result, the motion was deemed denied by operation of law on July 5, 2022. See Rule 59.1, Ala. R. Civ. P.

"_____

"[1]The sibling's paternity is unclear from the record.

"[2]At some point, the father had been charged with driving under the influence of alcohol."

390 So. 3d at 1104-09.

10

On September 1, 2023, this court reversed the juvenile court's judgment finding the child dependent because, we held, the evidence was insufficient to support dependency at the time of the permanency hearing. In summary, the Limestone County Department of Human Resources ("DHR") had become involved with the family based upon indicated domestic violence by P.H. ("the father"), some indication of neglect, and the need for parenting skills. At the time of the permanency hearing in 2022, the mother had separated from the father. The mother had also completed classes on domestic-violence awareness, budgeting, and parenting as required by DHR. The mother had continued to take classes after completing the required courses. Also, the mother had secured employment as required by the juvenile court. The mother had never tested positive for any illegal drugs. The paternal grandfather and N.S. had complained that the mother had provided them with only $200 in child support. Even so, the mother essentially had had physical and legal custody of the child until December 7, 2021, and, following that, the mother had had unsupervised visitation every weekend during which she provided for the child's needs. Although counsel for the paternal grandfather and N.S. had made the point during cross-examination of

11

the mother during the 2022 permanency hearing that the mother's prospects for higher-paying jobs were limited because of her having only a high-school diploma, we observed that poverty, in the absence of abuse or lack of caring, should not be the criteria for taking a child away from a parent. 390 So. 3d at 1117. The DHR social worker who testified at the permanency hearing stated that she had no concerns about the mother's ability to care for the child, and the juvenile court had awarded the mother unsupervised visitation with the child. E.W., 390 So. 3d at 1118.

While the mother's previous appeal was pending, the paternal grandfather and N.S., on May 3, 2023, filed a petition to terminate the mother's parental rights. The paternal grandfather and N.S. alleged that the mother was unable to discharge her parental responsibilities to the child, that the mother's conduct rendered her unable to care for the child, and that this conduct was unlikely to change in the foreseeable future. Specifically, they alleged (1) that the mother suffered from a mental illness and was unable to care for the child; (2) that the mother had failed to provide for the material needs of the child; (3) that the child did not have bowel movements on weekend visits with the mother; (4) that the

12

child would hide snacks in her overnight bag when packing for weekend visitation with the mother; (5) that the child would use inappropriate language following her weekend visits with the mother, that on one occasion the child had bruises, a swollen eye, and a bite mark that the mother claimed were from the child's younger sibling; (6) that on another occasion, the child had a handprint on her leg due to the mother having spanked the child; (7) that occasionally, the child had returned from visits with excrement on her clothing; (8) that the child would have tantrums before leaving to visit the mother; (9) that the child's pediatrician threatened to notify DHR if the child continued weekend visitation with the mother; and (10) that the mother had moved five times since the child was born and would likely never have consistent housing.

On May 24, 2023, the mother filed an answer. On June 20, 2023, the juvenile court entered an order stating that the parties had entered into an agreement regarding the child whereby the mother would have weekly supervised visitation with the child. Those visits would be supervised by J.C., N.S.'s adult daughter.[1] The juvenile court set the

---

[1]Our opinion in the first appeal misidentified J.C. as the paternal grandfather's daughter based on allegations in DHR's petition filed on April 16, 2021. J.C. is, in actuality, N.S.'s daughter.

13

paternal grandfather and N.S.'s termination-of-parental-rights petition for a status conference on September 29, 2023.

On September 7, 2023, shortly after this court issued its opinion in E.W., the paternal grandfather and N.S. filed a motion for temporary custody alleging that it was in the child's best interest that she remain in their custody as she had lived with them for over a year. On September 13, 2023, the juvenile court granted the paternal grandfather and N.S. temporary custody, subject to the previously agreed upon supervised visitation schedule. On September 20, 2023, this court issued a certificate of judgment in the previous appeal. According to the mother, the juvenile court, on September 27, 2023, dismissed the original dependency petition filed in E.W., supra.

On October 27, 2023, the mother filed a motion to dismiss the termination-of-parental-rights petition. She argued that this court had concluded that the child was not dependent, and that the paternal grandfather and N.S. had to show that the child was dependent to prevail in their private termination-of-parental-rights petition. The mother further argued that she had suitable housing with a family member, that the mother's mental-health evaluation conducted in May 2021 had not

14

indicated that the mother was unable to care for the child (and no further examination had been requested), that the mother had been ordered to pay child support for the first time in April 2023 and had provided for the material needs of the child when the child was with her during weekend visitations, and that the mother had in no way abused or mistreated the child.

On November 15, 2023, the juvenile court set the termination-of-parental-rights petition for a final hearing on January 11, 2024. On December 11, 2023, the paternal grandfather and N.S. filed an amendment to their petition, no longer seeking termination of parental rights and instead alleging that the child was dependent as to the mother and the father. The paternal grandfather and N.S. asserted that both the mother and the father suffered from mental illness; that neither the mother nor the father had provided for the material needs of the child; that the child had been constipated during weekend visits with the mother; that the child hides snacks in her overnight bag when packing for weekend visitation with the mother; that the child had used inappropriate language following her weekend visits with the mother; that, on one occasion, the child had exhibited bruises, a swollen eye, and

a bite mark that the mother had claimed were from the child's younger sibling; that, on another occasion, the child had had a handprint on her leg because the mother had spanked the child; that occasionally, the child had returned from weekend visits with the mother with excrement on her clothing; that the child had had tantrums before leaving to visit the mother; that the child's pediatrician had threatened to notify DHR if the child continued weekend visitation with the mother; and that the mother had moved five times since the child was born and would likely never have consistent housing.

On December 19, 2023, the mother filed a motion to dismiss the dependency petition, and she sought the immediate return of the child to her custody. The mother argued that the juvenile court had failed to return the child to her after this court had rendered its opinion finding insufficient evidence of dependency; that the paternal grandfather and N.S. had actively interfered with the mother's relationship with the child; that the longer the child was away from the mother, the more harmful the effect would be on the child-parent bond; and that there were no set of facts asserted in the termination-of-parental-rights petition or the

16

amended petition alleging dependency that would support interfering in the mother's relationship with the child. The mother asserted:

"The [m]other is presently able to provide for the minor child, has suitable housing, and is willing and able to discharge her parental responsibilities. The mother is employed, she is now eligible to receive food stamps for herself and her children, even though she is living with a family member, and she is eligible to receive Medicaid benefits for herself and her son, and she will be able to get Medicaid for the minor child at issue if she has custody of the child. The mother has maintained stable housing for more than a year and that housing has already been viewed and found acceptable by both the Guardian Ad Litem and the CASA [Court-Appointed Special Advocate] appointed by this court to represent the best interest of the child. The mother's present ability to provide for the minor child is currently better than it was on May 30, 2022, at the permanency hearing, and her condition at that time was insufficient to find the child dependent, based on the recent decision of the Court of Civil Appeals."

On December 28, 2023, the juvenile court set the mother's motion to dismiss for a final hearing on January 11, 2024. At that hearing, which began on January 11, 2024,[2] counsel for the paternal grandfather and N.S. stated that the father could not be found and that court rules

---

[2]The court reporter's transcript states that the hearing began on January 1, 2024. However, it appears that the hearing was held on January 11, 2024. The hearing was continued on February 14, 2024.

prevented service by publication.[3] Counsel for the paternal grandfather and N.S. stated that all the evidence at the hearing related to the mother. The juvenile court and counsel for all the parties discussed the impact of this court's ruling in E.W., contempt, and res judicata along with the mother's motion to dismiss. The juvenile court stated:

> "I think the motion to dismiss is due to be denied, but ultimately, I'm going to hear all the evidence there is to offer today and there's going to be a binary choice here at the end. The child is either dependent or not. If I find based on the evidence the child is not dependent, then the case will be dismissed. Obviously, if I do, then we'll go from there."

Whitney George, a licensed independent clinical social worker employed by Family Support Services, LLC, testified that she had observed the child in play therapy beginning in April 2023. George stated that N.S. had brought the child to Family Support Services because the child was having behavioral and emotional issues. George said that the child participated in play therapy twice a month. She stated that the child seemed "more clingy" to N.S. after the child had visited with the mother. George said that the child did not exhibit any anger during play

---

[3]Rule 13, Ala. R. Juv. P., provides that there shall be no service by publication of any proceeding in juvenile court except in proceedings to terminate parental rights and proceedings to remove the disabilities of nonage.

therapy. She said that the child did not "bring up" the mother on her own during therapy. George testified that typically she would get information from N.S. regarding the child's behavior, and then work with the child through play therapy. George testified that, since the child's therapy had begun, the child had had fewer behavioral problems according to N.S. When asked if it would be traumatic for the child to be removed from one home and placed in another, George stated "I think so. I think that would be for any kid." George described the child as "sassy," but not aggressive.

The mother testified that she lives with her father R.W., his girlfriend, and her youngest child and that she had lived there for two years. The mother stated that before she lived with her father, she had lived with the maternal grandmother when her youngest child was born and that she had lived at that house for five to seven months. The mother testified that she had lived with the father of the child for four months and before that, she and the father of the child that is the subject to the dependency petition had lived with N.S. The mother admitted that R.W., her father, had been convicted of harassing the paternal grandfather and N.S.

19

The mother testified that she and the maternal grandmother worked with a cleaning-services company. The mother testified that family members watch her youngest child while she works. The mother testified that she had worked as a waitress for three or four months until there had been a conflict over taking one of her children to the emergency room. The mother testified that she had previously worked at a grocery store as a cashier and at an automobile supply store. The mother admitted that she had consistently not held a job for longer than six or eight months. The mother testified that she owned an automobile that her grandparents had given her, that the automobile was insured under her father's policy, but that she pays her father for that coverage.

The mother testified that the last time that she had overnight visitation with the child was in April 2023. The mother testified that since the child was born in April 2020, she had had custody of the child for approximately four months and that she had had full custody of the child for three months beginning in May 2021.

The mother stated that she was typically not aware of the child's doctors' appointments until after the appointment had occurred and that she had not attended any of the child's doctors' appointments in the last

eight months. The mother was asked about whether the child had ever been bruised during a visit with her, which the mother believed happened one time. The mother said that she had allowed her youngest child to use "Facetime," a video teleconference service, to communicate with the child when the mother did not have to leave for work. The mother testified that the child did not attend the youngest child's birthday party. The mother was asked whether it would be beneficial for the child and the youngest child to have a relationship. The mother stated that it might not be beneficial to both of them at this time because the children sometimes bite and scratch each other. The mother explained that some of the issues raised in the court proceedings had concerned bites and marks on the child. The mother testified that the youngest child had attended the child's birthday party until the youngest child became "cranky."

The mother testified regarding her supervised visitation with the child, stating that the visits were "fairly good." She said that the child's behavior depended on how the child felt that day. The mother testified that the child occasionally had temper tantrums because she was three years old. The mother also said that the child had "cursed" at her. The

21

mother acknowledged that the child may have been returned to the paternal grandfather and N.S. with a wet diaper because the mother had to drive over an hour to return the child to the paternal grandfather and N.S.'s house.

The mother testified that she had provided the paternal grandfather and N.S. with a $200 check for the child's support, but that they had not cashed the check. The mother explained that when she had had the child on the weekends for visitation, she had provided for the child's material needs while the child was with her. The mother admitted that she was ordered to pay child support in April or May 2023. The mother admitted that she was not sure of the child's current clothes size because the child was growing. The mother testified that she had given the child clothes in April 2023 and, at that time, the child was a size eight. The mother stated that she had sent the child undergarments through a delivery service, but that she had not purchased shoes for the child, nor had she paid for the child to have a haircut. The mother stated that she had purchased toys for the child for the child's birthday and for Christmas. She said that she would bring coloring books and "slime" to her supervised visits with the child. When asked whether she had paid

the child's "copays" for doctor visits, the mother stated that she was unaware that there were copays. The mother indicated that the child had Medicaid and that co-payments and prescriptions were covered by Medicaid. The mother admitted that she had not purchased any over-the-counter medication for the child in the last nine months.

The mother was asked whether she had been told that the child had problems with her kidneys and was shown a text message from N.S. stating that "[T]hey said her blood pressure looks good. They looked at her kidneys and they're a little big, but other than that, she looks great." The mother admitted that she had not asked N.S. about the child's kidneys since receiving that text one week before the hearing. The mother admitted that she had been asked to bring the youngest child to Christmas at the paternal grandfather and N.S.'s house because the child had wanted to see the youngest child, and the mother had responded to the text message "[T]hanks for the offer, but he will be at our family Christmas." The mother was asked whether the paternal grandfather and N.S. had offered her additional time with the child in the last eight months, and the mother responded that she had been allowed an extra hour for a visit to a pumpkin patch.

The mother was asked what she had done to improve her situation to regain custody since the juvenile court granted temporary custody to the paternal grandfather and N.S. following this court's decision in E.W. The mother responded that she had followed court orders and visited the child when she was allowed to do so. The mother admitted that the Facetime visits between the child and the youngest child had not always occurred because the youngest child is two years old and has hearing problems. The mother explained that she was cooking dinner on one occasion and could not get the youngest child to the telephone for the Facetime visit.

Tim Rolfe, a licensed independent social worker, testified that he had conducted a bonding assessment at the request of the paternal grandfather and N.S. Rolfe said that he had conducted approximately 15 bonding assessments in the past. He stated that a bonding assessment consists of a clinician going to the home of a caregiver of a child to assess multiple areas to determine whether a strong bond had developed between the child and the caregiver. Rolfe testified that he was in the paternal grandfather and N.S.'s home for two and a half hours conducting

assessments, interviews, and observations. Rolfe was asked about the timeline for bonding, and he stated:

> "So when we look at the timeline, it's kind of anticipated that it's likely that a bond would start to develop between a caregiver and a child within the first three months. Six months of time, yeah, it's gonna be a little bit more probable, but then after 12 months, we can almost guarantee that there is a strong bond and attachment develop [sic] between a caregiver and child based on all things being normal and, you know, family member, the absence of any severe neglect or any issues like that."

Rolfe testified that he also looks for the caregiver's willingness to engage, play, and communicate with the child. Rolfe stated that the child identified the paternal grandfather and N.S. as family and that the child had strongly bonded with them. He said that there are high risks for disrupting a bonded child. Rolfe testified that the paternal grandfather and N.S. had told him that they had observed the child become irritable, distracted, and uncomfortable when the child was preparing to visit with the mother. Based on the statements from the paternal grandfather and N.S., Rolfe stated that those behaviors were classic signs of "avoidant" behaviors that a child who is being placed with someone to whom the child was not bonded. Rolfe testified that if a child is moving every six to eight months, then that child's environment jeopardizes bonding. Rolfe

recommended that the child remain with the paternal grandfather and N.S. and that they have authority to determine who is in the child's life.

Rolfe testified that if there had to be a disruption in custody that the child would need intensive therapy and treatment to ensure the best possible outcome for the child. Rolfe was asked if the mother would have had the same type of bond with the child, if the mother had had the same amount of time with the child as the paternal grandmother and N.S. He stated that it was possible if the home environment was healthy. Rolfe testified that he had never observed the child and the mother and that observing the child and the mother was not part of the bonding assessment. Rolfe testified that his recommendation that the paternal grandfather and N.S. retain custody of the child because of their bond derived from research and on "observable indicators, clinical, observable indicators" that would indicate a strong bond. Rolfe testified that it would harm the child if she were removed from the home because she had a strong bond with the paternal grandfather and N.S. When asked if, ultimately, the bonding he had observed was not "particularly based on the facts" but was instead based upon the fact that the child had been with the paternal grandfather and N.S. for most her life, Rolfe responded

affirmatively. Rolfe said that the bonding between the paternal grandfather and N.S. was not surprising because the home environment was a healthy one where the caregivers understood how to properly care for and raise the child.

J.C., the daughter of N.S., testified that, with her mother's agreement, she had been supervising the mother's visits with child since September 2023. She stated that not all of the visits with the mother and the child had gone well. J.C. described a recent visit where the child had become angry and screamed because the mother was not playing "cops" the way that the child wanted. She stated that when the child had arrived home after the visit with the mother, the child would be pretty calm. J.C. testified that multiple visits had not gone well. She stated that during a visit with the mother at a Burger King restaurant, the child was "buck wild," unsettled, and unhappy. J.C. said that the child had not been that way before the visit with the mother. J.C. stated that the child used foul language during her visits with the mother and that the child did not hear foul language at home with the paternal grandfather and N.S. J.C. stated that the child's foul language was specifically

expressed towards the mother. When asked to provide an example of a visit that went well between the mother and the child, J.C. stated:

> "Usually, … I want to say it was one at the library where she pretty much just got to do whatever she wanted as long as her mother did not tell her 'You know you can't do this, you can't do that.' She was pretty okay as long as you kind of just give her her way. She was fine."

J.C. testified that, during the visits between the mother and the child, she can hear them and that she had not heard the mother use foul language. J.C. testified that the mother had had conversations with the child that had made the child feel guilty. J.C. stated:

> "If [the child] does something wrong or if [the child] will hit [the mother], just playing, she will make [the child] apologize multiple times and you can kind of tell it kind of hurts [the child's] feelings and [the child] just kind of just guards up a little bit."

J.C. testified that when the child returned from unsupervised weekend visits with the mother, the child would be guarded, "sheltered" and "really hungry" when she returned. She stated that the child would hoard food. J.C. testified that she had never supervised a visit where the child's half-brother was present. J.C. clarified that the child had heard foul language spoken and occasionally used the words in context, indicating that she had heard someone speak those words.

28

Austin Pike, a supervisor for the Court-Appointed Special Advocate ("CASA") program, testified that she had been involved in the original dependency case. She stated that she continued to be involved and had prepared a report for the juvenile court recommending that the child remain with the paternal grandfather and N.S. because the child had bonded with them because she had been with them the majority of her life. Pike stated that she had concerns about the mother but that she did not outline all of those concerns in her report. Pike's report stated that the child told her that she did not want to live with the mother and that the child said she did not want to visit with the mother without J.C. present. Pike wrote in her report that "there has been an ongoing concern in regards to the level of care that [the child] received while in the care of the mother." Pike testified that she had visited the mother at her residence during the original case. Pike said that previously, whenever the child had returned from visitation with the mother, the paternal grandfather and N.S. would call her when the child had bruises and rashes.

Pike testified that the child's pediatrician had contacted her regarding the child's visits with the mother following the child's "three-

year-old" visit. According to Pike, N.S. had told the pediatrician that there was a court order involving the child and that the child had been assigned a CASA volunteer and a guardian ad litem. Pike said that she had then reached out to the guardian ad litem.

N.S. testified that the child had primarily lived with her and the paternal grandfather since she was about four months old. N.S. stated that when the child had to visit with the mother on the weekends, the child would become angry. N.S. said that the child would also try to pack extra snacks and juices to take with her for visitation. N.S. said that she, the paternal grandfather, and her daughter-in-law had used their cellular telephones on occasion to record the child's behavior when the child had to visit with the mother. Four recordings of approximately a minute each were admitted into evidence and shown in court.

N.S. testified that there were occasions when the child would return from the mother's house with scratches and bite marks. She also stated that a previously admitted photograph depicted the child with a bruise on her eye. N.S. stated that since 2022, the child had returned from the mother's house with bug bites. N.S. testified that photographs taken in 2023 showed the child with red bites and a rash on the child's lower legs

and back. N.S. stated that the child had returned from the mother's house in urine-soaked clothes.

N.S. testified that a court in Tennessee had ordered the mother to pay child support. She said that before the court order, the mother had provided some toilet-training underwear, a Valentine's Day present, and, on occasion, food to her supervised visits with the child. She said that the mother had never offered to pay the child's co-payments for doctor visits. N.S. testified that when the child would return from the mother's house, she would use foul language, and that the child would eat as if she had not eaten all day. N.S. said that the child had used the foul language in context.

When asked about the child's health, N.S. had responded that the doctors were watching her kidneys. She explained that

> "… when [the child] got RSV [respiratory syncytial virus], her blood pressure was staying elevated a little bit every time she got sick, and especially when she had RSV so they wanted her to be rechecked a couple of times. So the last time she was rechecked, they let a kidney doctor look at her too. At that time, her kidneys are supposed to be like a 5, between a 5 and a 6. Her left kidney is a 9.1. Her right kidney is a 8.2, which it a little large, but they said it could be a genetic thing because our other grandkid has some kidney issues as well."

31

N.S. stated that the child should not drink tea or other dark-colored liquids. N.S. said that she had told the mother about the child's kidney issues but that the mother had not asked N.S. any questions about the child's kidneys. N.S. said that the mother had been to one or two of the child's dental appointments with N.S.

N.S. testified that the mother and the child had communicated by Facetime. N.S. said that the calls were "usually every day." N.S. said that in April and May of 2023, the mother's communication with the child had been inconsistent. When asked whether the mother had gone a month without communicating with the child, N.S. responded that it was usually just a few days. N.S. stated that the child had been excited to communicate with the mother's youngest child, but that it was frustrating for the child to communicate through video teleconference. N.S. said that she stopped the calls when the child became too frustrated and also when the maternal grandfather and his girlfriend would get on the calls and talk with the child. N.S. said that she had a "history" with the maternal grandfather. N.S. said that she had offered to let the child communicate with the mother's extended family, but not all of them at one time.

N.S. testified that the child was "chubby," and that the child's pediatrician had recommended that the child drink two percent milk but added that no one had expressed concerns over the child's weight. N.S. testified that she "started this case based on concerns" from the child's pediatrician when she had relayed certain information to the child's pediatrician at the child's "three-year-old" checkup. N.S. stated that she was afraid that she would lose custody of the child if she had allowed further weekend visitation with the mother. N.S. testified that the pediatrician had recommended play therapy. N.S. said that the child's behavior had improved with play therapy. She also stated that the child's behavior had improved when the mother's visits were changed to supervised visitation.

N.S. testified that she was afraid that if the child were returned to the mother, then N.S. would not be allowed to see the child. N.S. stated that she believed it was in the child's best interest to remain with N.S. and the paternal grandfather.

When asked about the child returning from a visit with the mother covered in urine, N.S. stated that the urine was down the child's legs and in the child's hair. N.S. said that she had contacted the CASA worker

33

when it happened. N.S. was asked about the child's adverse reaction to anesthesia when the child had had her tonsils and adenoids removed. N.S. stated:

> "So when she had her tonsils and adenoids out and had her -- she had little holes put in her eardrums because she was having a lot of ear infections just to help the drainage, she -- her (inaudible) kind of just stayed sleepy for an extra couple of days and she stayed really constipated and she couldn't poop so they had to give her a lot of Miralax and we had to go to the doctor a lot because she had to have a cleanout because all of the medication they gave her during anesthesia just kind of stopped her stuff from working. So therefore, she couldn't poop for like a week or two and it was really making [the child] really sick from that and they said it was from the anesthesia and that it just -- it happened and it was just a reaction that she had to the anesthesia and they said she would probably always have that."

N.S. testified that after the child returns from her two-hour supervised visitation with the mother, the child may use foul language. She said that the child's use of foul language had decreased. N.S. testified that when the mother had had weekend visitation with the child, it would take a few days to get the child back on her schedule. She stated that the child would have "potty mouth" for a few days after weekend visitation with the mother.

N.S. testified that the child is on several allergy medications. She said that the paternal grandfather smokes but not inside the home.

34

N.S. testified that the paternal grandfather washes his hands and changes his clothes after he smokes. N.S. testified that she had filed a termination-of-parental-rights petition, which had been amended to a dependency petition, based on concerns from the child's pediatrician. The following exchange between N.S. and counsel for the mother regarding the pediatrician occurred:

"Q. Okay. So in the petition, there's a lot of allegations. There's several different ones. So when the pediatrician was concerned because -- and I don't know if you told her all of these things over several visits or if it was at her checkup that all of this just kind of came out?

"A. Her 3-year-old checkup.

"Q. How long would you say, just cumulatively speaking, all that stuff happened over a span of what timeframe?

"A. What do you mean?

"Q. All the stuff that's in the --

"A. Been going on?

"Q. The petition, yeah, as far as the coming back soiled, the bite. Like what are we talking about, all this within a 3-month time frame, 6-month time frame?

"A. Basically, she's had a lot of stuff going on since she started the unsupervised weekend visits. I tried to resolve it with her by talking to her and communicating with her. Tried to let it get better. Trying to coparent. It didn't. And then when it just kept getting worser and kept getting worser, then

35

I decided to talk with my pediatrician to see if I was being overprotective or if this is something that really needed to be addressed.

"Q. Okay. All of these issues that came out that day, had you talked to your CASA representative, [the child's] CASA rep or her guardian ad litem about all of these issues prior to that?

"A. Yes. I had started making them aware of what was going on. Also, I had emailed [counsel] to let him know what was going on and sent them some pictures just as well to let them know what was going on. And they also, you know, was like --

"… .

"A. There again, we tried to direct to coparenting with [the mother] and try to work things out there.

"Q. So this was just a cumulative thing?

"A. Yes.

"Q. At her checkup, it all kind of got addressed at once and that's what started the petition and prompted the concerns?

"A. Uh-huh.

"Q. Okay So you mentioned that you're afraid that you will never see [the child] again if her mother gets her back, right?

"A. Uh-huh.

"Q. So you would be agreeable without a court order to facilitate visits and try to still foster that relationship between [the child] and [the mother]?

"A. Yeah.

"Q. But you wouldn't force it, so what do you mean by that?

"A. I mean, I've always been open to [the mother coming] to my house. For an example, on [the child's] birthday, her third birthday, I messaged her and not only invited [the youngest child], but I invited her to come and go with us and do stuff. I've never tried to keep [the mother] out of anything as far as with our family. I even once in messages before this case -- I can't even say it now -- but I've always tried to keep a relationship with [the mother] with [the child]."

N.S. testified that the mother had paid child support after being ordered to do so. She stated that the mother had missed one payment. After N.S.'s testimony, the hearing was continued and resumed on February 14, 2024.

Dr. Ami Manners, the child's pediatrician, testified at the reconvened hearing that, at the child's three-year-old check-up, N.S. had told Manners that she had concerns about the child. Manners stated that she had concerns based on conversations with N.S. Manners said that she had reached out to the CASA worker and reported the concerns. Manners stated that the CASA worker had contacted the paternal

37

grandfather and N.S.'s counsel and that counsel had then contacted Manners.

Manners testified that the child had had problems with constipation and that she had recommended the use of a "Miralax" brand laxative to treat the condition. Regarding the child's use of a pacifier, Manners stated that she recommended weaning a child off of a pacifier by three, but at the latest, four years of age. Manners testified that the child had multiple visits where she had exhibited elevated blood pressure. Manners explained that an elevated blood-pressure reading did not necessarily mean a diagnosis of high blood pressure or hypertension, but it "just prompts further evaluation." Manners was asked whether she had concerns about the child's weight and she responded that she had discussed the child's weight with N.S. and had suggested cutting back and changing the child's diet. The child's medical records admitted at the hearing indicated that on August 30, 2023, the child weighed 55 pounds at 3 years, 4 months, and that on November 28, 2023, the child weighed 57 pounds and 8 ounces at the age of 3 years, 7 months. When asked if it would be normal for an overweight child to have elevated blood pressure, Manners responded: "It can, but that's not

always the case. I mean, there can be other reasons, but there certainly is a correlation with your weight."

Manners testified that the child had been evaluated on July 25, 2023, with some insect bites on her chest, legs, and torso. N.S.'s chief complaint was that bug bites on the child's legs appeared to be different from the bug bites on the child's chest. The child's medical records indicated that the doctor reported that:

"bug bites on legs -- though mosquito bites, occurred about 1 week ago and then woke up this morning with bites on torso too

"has two dogs and on flea/tick medication

"went to the park yesterday and played in sand

"no fever

"started mild cough this morning

"wondering what bug spray to use

"has been using natural spray for kids"

Manners testified that it was hard to determine which bug has caused a bite. Manners testified that the child had come to the office on August 21, 2023, for a rash associated with a fever and cough. The child had an ear infection and was prescribed antibiotics. Manners was asked

whether nine "sick" visits from April to November was "normal" and Manners responded that it could be because every child's health is different.

Emma Grantham, an occupational therapist, testified that the child was being treated at the facility where she was the lead occupational therapist. Grantham did not treat the child, but she described the duties of an occupational therapist. When asked if she was a mandatory reporter of child abuse, Grantham responded that she was.

N.S. was recalled as a witness and testified that the laxative Miralax was listed on the child's school form to be given as needed. N.S. was asked about bug bites on the child; she responded:

> "A. She had been to a park. She goes to a park sometimes to do visits, so she had been to a park. She'd been to the park with me. She'd been around animals. It was like two bites, but they didn't look good, so I took her in to have it checked out to make sure it was okay.
>
> "Q. Now, this was in February of 2023?
>
> "A. 2023, so I'm not for sure if that was from when she came from mom's, because she came from mom's once and she had a bunch of bites on her then. And then she had one -- she started supervised visits. We did those at the park and she got a couple of bites on her from the park as well.
>
> "Q. Okay. But it was unidentified?

"A. Yeah.

"Q And the bites since you've had her July 25th and August, those were unidentified bites as well? Like they --

"A Now, the ones when we first started, when she first got ate up all over, those were defined as bedbugs."[4]

N.S. testified that when the child has a cough, it is a "pretty good cough" before she takes the child to the doctor. N.S. stated that winter months are harder on the child because of her allergies and asthma. N.S. acknowledged that the child needed crowns for her two front teeth but had not undergone such dental procedure because the child would have needed general anesthesia, that the child had had problems with anesthesia, and that N.S. did not feel it was in the child's best interest to put the child to sleep just for placing caps on juvenile teeth that would fall out in a few months or years.

The mother was recalled as a witness and testified that she lived with her father, his girlfriend, and her youngest child. She stated that she was currently employed with Environmental Services, a cleaning-

---

[4]In E.W., supra, the paternal grandfather and N.S. had alleged that the child had been covered in bedbug bites. However, they presented no evidence to support this allegation. See E.W., 390 So. 3d at 1116. Moreover, Manners testified in the current proceedings that it is difficult to determine which insect has caused a particular bite.

services company, and was starting the following week as a supervisor. The mother stated that she had been working there for eight or nine months. The mother said that she had medical insurance with Medicaid; that the child was eligible for Medicaid; and that after a certain period, the mother would be eligible for health insurance through her employer. The mother testified that her youngest child had special needs requiring speech therapy because he was nonverbal. The mother stated that she had looked at schools and daycare for the child in the city where the mother lives. The mother said that she had secured a pediatrician and dentist for the youngest child. She stated that the youngest child was not in daycare because of his special needs and that family members helped to care for that child while she worked. The mother testified that the youngest child was deaf in one ear and partially deaf in the other ear.

The mother testified that it takes 45 minutes for her to drive from her home to visit with the child. The mother stated that she had attended all of the supervised-visitation sessions with the child except for one, when the mother had to cancel because she was sick.

The mother described her relationship with N.S. as cordial. The mother testified that N.S. had notified her when the child had been taken

to the emergency room on one occasion. The mother went to the emergency room. N.S. and J.C. went back with the child while the mother waited with J.C.'s wife and N.S.'s cousin. The mother then went back to see the child.

The mother explained that she did not bring the youngest child to supervised visitations with the child because she goes to work from the visits. The visits are from 3:00 p.m. to 5:00 p.m. The mother acknowledged that, on at least one occasion, N.S. had offered to allow the youngest child to visit with the child at N.S.'s house. The mother said that she had declined because of the youngest child's special needs.

The mother recalled two occasions when the child had returned to the paternal grandfather and N.S.'s house with wet clothes. The mother explained that on one occasion, the child had had a toileting "accident" on the drive from the mother's house to the paternal grandfather and N.S.'s house, and that, on the other occasion, the child had spilled a Gatorade-brand drink on herself. The mother explained that, on another occasion when the child was being returned, the child had soiled herself, the mother had stopped to change the child, and the child had then had another toileting "accident" when they arrived. The mother said that the

43

child had been in underwear rather than a diaper because the mother had been trying to maintain the paternal grandfather and N.S.'s potty-training schedule. The mother testified that her child-support payments were current.

The mother was asked if she had been working for Environmental Science for nine months. The mother explained that the company's name had changed and that part of the time she had worked as an independent contractor for her mom, who had been performing services for the company before its name changed. The mother stated that she would start with the company next week.

On cross examination, the mother reiterated that her child-support payments were current. The mother was asked whether the child had misbehaved at school following a weekend visit with the mother. The mother explained that she was no longer having weekend visits with the child in August 2023, when the child had misbehaved. The mother stated that she had had a visit with the child four days before the child had "acted up" at school. The mother admitted that the child had been constipated when she was visiting the mother's house and that she had given the child Miralax. The mother stated that the child had some

44

bleeding after the ensuing bowel movement but that she did not take the child to the hospital. The mother acknowledged that she would have to rearrange her work schedule if the current supervised-visitation schedule continued.

On February 29, 2024, the juvenile court entered a judgment again declaring the child to be dependent and awarded custody to the paternal grandfather and N.S. The juvenile court found that the child had resided with the paternal grandfather and N.S. for most of her life, that the child had developed a bond with the paternal grandfather and N.S., that the bonding expert testified that a disruption in custody would harm the child, that the mother had not made strides towards bonding with the child, that the mother had agreed to visitation supervised by J.C. (who had testified that the mother's visits did not always go well), that the child did not ask about the mother unless prompted to do so, and that the child's behavior deteriorated after visits with the mother. The juvenile court further found that the mother was not forthcoming about her employment status, that the mother did not know the child's clothing size and had not purchased clothing for the child, that the mother had not participated in doctor's or dentist's appointments for the child, that the

mother had "gone out of her way to ensure" that the child had no contact with her younger sibling "out of spite" for the paternal grandfather and N.S., and that the mother had been unwilling to maintain a collaborative relationship with the paternal grandfather and N.S. despite that being in the best interest of the child.

The juvenile court further stated:

> "With regard to visitation between the mother and the minor child, the Court has concerns about the mother's ability and willingness to provide a safe and nurturing environment for the minor child. The Court received evidence that the child returned from overnight visits in the past with bug bites, bruises, soiled clothing, and a bad attitude. There was at least one occasion when the child returned from a visit and attempted to hoard food, indicating that she had not been appropriately fed. The Court would also point out that in light of the fact that it's in the child's best interest to remain in the home of [the paternal grandfather and N.S.], it is, likewise, in her best interest for the mother and [the paternal grandfather and N.S.] to find a way to repair their relationship and begin to work together on providing for the physical and emotional needs of the child."

The juvenile court awarded the mother a minimum of three hours of visitation per week, to be supervised by the paternal grandfather and N.S. The juvenile court stated that the mother could have additional visitation with the child "as agreed upon by the parties." The juvenile court awarded the father supervised visitation with the child of up to one

hour a month if the father "presented himself" and if the paternal grandfather and N.S. believed a visit would be safe. The juvenile court stated that the father could have additional visitation "as agreed between the parties."

On March 5, 2024, the mother's trial counsel filed a motion to withdraw, which the juvenile court granted and appointed new counsel for the mother. On March 8, 2024, the mother appealed.

### Standard of Review

" ' "On appeal from a judgment finding a child dependent following an ore tenus proceeding, we presume the juvenile court's factual findings are correct. J.W. v. C.H., 963 So.2d 114, 119 (Ala. Civ. App. 2007). Those findings will not be disturbed if they are supported by sufficient evidence. Ex parte Floyd, 550 So. 2d 982, 984 (Ala. 1989). In passing on the question of the sufficiency of the evidence as to a finding of dependency, this court does not reweigh the evidence; instead, this court determines whether the juvenile court, acting in its fact-finding role, reasonably could have determined from its own weighing of the evidence that the dependency of the child was proven by clear and convincing evidence .... J.B. v. DeKalb County Dep't of Human Res., 12 So. 3d 100, 112 (Ala. Civ. App. 2008)." '

47

> "'R.F.W. v. Cleburne Cty. Dep't of Human Res., 70
> So. 3d 1270, 1272 (Ala. Civ. App. 2011).'
>
> "N.G. v. Blount Cty. Dep't of Human Res., 216 So. 3d 1227,
> 1233 (Ala. Civ. App. 2016)."

J.P. v. D.P., 260 So. 3d 862, 870 (Ala. Civ. App. 2018).

## Discussion

The mother argues that res judicata should bar the current petition filed by the paternal grandfather and N.S. Specifically, she argues following this court's decision released on September 1, 2023:

> "The new petition was filed in December 2023, just over three months later. In fact, the child was never returned to the mother after the ruling of [the Alabama Court of Civil Appeals]. The child was taken to the pediatrician by the Petitioners, who then alleged that the doctor threatened to call DHR if they allowed [any more] unsupervised visits with [the mother]. There was never time for any new allegations to arise in regards to the child. Additionally, the mother was without an attorney at the time, and had no knowledge that new litigation was taking place."

The mother also argues that the juvenile court's judgment is not supported by clear and convincing evidence of dependency.

We agree that, irrespective of the mother's res judicata contention, the judgment under review is erroneous because the evidence presented to the juvenile court did not rise to the level necessary to support a

finding that the child was dependent pursuant to §12-15-102(8), Ala. Code 1975, as found by the juvenile court in its judgment.[5] Section 12-15-102(8), sets out the definition of a dependent child, providing,

> "(8) Dependent child. a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
>
> "1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in Section 12-15-301 or neglect as defined in Section 12-15-301, or allows the child to be so subjected.
>
> "2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.
>
> "3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.
>
> "4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance

---

[5]The paternal grandfather and N.S.'s amended petition asserting dependency alleged that the mother was mentally ill and unable to care for the child. No mental exams were requested, however, and there was absolutely no evidence of mental illness presented.

with the terms of the compulsory school attendance laws of this state.

"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"7. Who has been placed for care or adoption in violation of the law.

"8. Who, for any other cause, is in need of the care and protection of the state."

There is nothing in the juvenile court's findings to support dependency under § 12-15-102(8). In H.A.S. v. S.F., 298 So. 3d 1092, 1097-98 (Ala. Civ. App. 2019), this court stated:

"'[T]he test [for determining whether a petitioner has established a child's dependency] is whether [the petitioner] has presented clear and convincing evidence demonstrating that the parental conduct or condition currently persists to such a degree as to continue to prevent the parent from properly caring for the child.' M.G. v. Etowah Cty. Dep't of Human Res., 26 So. 3d 436, 442 (Ala. Civ. App. 2009) (plurality opinion). The juvenile court may consider the totality of the circumstances when making a finding in a dependency proceeding. G.C. v. G.D., 712 So. 2d 1091, 1094 (Ala. Civ. App. 1997). See also D.P. v. State Dep't of Human Res., 571 So. 2d 1140 (Ala. Civ. App. 1990). This court cannot reweigh the evidence presented to the juvenile court, and we

cannot revisit its conclusions about the credibility of the witnesses before it. See Ex parte R.E.C., 899 So. 2d 272, 279 (Ala. 2004). Although the juvenile court's factual findings in a dependency case when the evidence has been presented ore tenus are presumed correct, T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006), a finding of dependency must be supported by clear and convincing evidence. Ala. Code 1975, § 12-15-310(b). When reviewing a dependency judgment on appeal, '[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing.' K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court '"must ... look through ['the prism of the substantive evidentiary burden,' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.'"' K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c))."

In the present case, the juvenile court found that the child had a strong bond with the paternal grandfather and N.S. because the child had spent most of her life with them and because the bonding expert testified that a disruption in custody would harm the child. However, Rolfe, the bonding expert, never evaluated the mother and the child's bond. Second, Rolfe testified that a bond forms when a child is with a caregiver in a healthy home environment for a length of time. Third, the

mother and the child's relationship had been interrupted as a direct result of the juvenile court's having acted outside its discretion in finding the child to be dependent in E.W.

The juvenile court further found that the mother had not made strides towards bonding with the child, that the mother had agreed to visitation supervised by J.C. (who had testified that the mother's visits did not always go well), that the child did not ask about the mother unless prompted to do so, and that the child's behavior deteriorated after visits with the mother. The juvenile court, in its judgment, stated that "[t]he Court recognizes that the mother's opportunities to do so [bond with the child] have been limited, to say the least, but the current visitation arrangement by which the parties have been operating was entered into as an agreement." It appears that the juvenile court faults the mother for not making strides toward bonding with the child because she had agreed to supervised visitation in June 2023 while the paternal grandfather and N.S.'s termination-of-parental-rights petition was pending and prior to this court's opinion in E.W. Based on the history of the paternal grandfather and N.S.'s past behavior (including filing an emergency petition for custody in October 2021 when the mother had

reached out to them to care for the child when the mother was hospitalized with the birth of her youngest child), the June 2023 agreement at least allowed the mother some interim visitation. On the other hand, the juvenile court found that the mother had not maintained a collaborative relationship with the paternal grandfather and N.S. As noted above, when the mother had agreed to supervised visitation as requested by the paternal grandfather and N.S., the juvenile court concluded that the mother was not making strides toward bonding with the child. Also, J.C., who supervised the visitation, was N.S.'s daughter, and her testimony regarding the mother and the child's visits "not always going well" indicated that J.C.'s chief complaint about the mother's relationship with the child was that the mother did not give the child her own way. Further, the juvenile court's finding that the child's behavior deteriorated following visits with the mother could be solely attributable to the child's age.

The juvenile court further found that the mother was not forthcoming with her past and current employment status. The mother's testimony indicated she had worked for a cleaning-services company, that she later worked as an independent contractor for her mother who

53

had worked for that cleaning-services company, and that she had recently been hired by the cleaning-services company after it had changed its corporate name. Regardless, the juvenile court did not find that the mother was unemployed, and the evidence also indicated that the mother was current with her child-support payments.

The juvenile court found that the mother did not know the child's clothing size because she had not purchased clothing for the child. The record indicated that the mother had recently purchased clothing for the child's Christmas present and that the child was a size 8. The mother also testified that she had provided for the child when she had custody and when she had weekend visitation. Although the mother was unaware of the child's clothing size at the time of the hearing, the record shows that the child had continued to gain weight while in the custody of the paternal grandfather and N.S. such that the child's pediatrician had asked that the child's calories be reduced. The juvenile court found that the mother had not participated in doctor's or dentist's appointments for the child. The mother explained that she usually did not know about the child's appointments until after the appointments occurred. Also, the mother went to the emergency room to see the child when N.S. had

54

notified her of the emergency-room visit. Cf. S.K. v. Madison Cnty. Dep't of Hum. Res., 990 So. 2d 887, 901 (Ala. Civ. App. 2008) (rejecting, in an appeal from a termination-of-parental-rights judgment, a finding that the father had neglected to provide appropriate dental care for his child when he had not taken the child to a dentist despite the fact that she had intermittently complained of a toothache, and rejecting a finding that the father had failed or refused to provide eyeglasses for the child where the only evidence presented indicating that the father somehow knew the child needed glasses was that the child's teachers had contributed money to purchase glasses for the child).

The juvenile court found that the mother had "gone out of her way to ensure" that the child had no contact with her younger sibling "out of spite" for the paternal grandfather and N.S. There was no evidence in the record to support that finding. The mother explained that the youngest child was two years old, deaf, and nonverbal. Obviously, video teleconference visits between the children would not have been easy based on the ages of both children and the youngest child's special needs. Also, when the mother had allowed the children to play, the children would occasionally scratch and bite. The mother declined N.S.'s offer for

the youngest child to spend Christmas at N.S.'s house at the request of the child because the youngest child was spending Christmas with the mother's family.

The juvenile court stated in its judgment that it had received evidence that the child had returned from overnight visits in the past with bug bites, bruises, soiled clothing, and a bad attitude. The mother explained that the child had had soiled clothing when the mother brought the child back from visitation because the mother lived an hour away from the paternal grandfather and N.S.'s house and the child was in the process of toilet training. The juvenile court found that on at least one occasion when the child returned from a visit, the child had attempted to hoard food, indicating that she had not been appropriately fed. Assuming that the child's hoarding indicated underfeeding,[6] there was no evidence that the child was malnourished while in the mother's care.

The juvenile court also stated it had concerns about the mother's ability and willingness to provide a safe and nurturing environment for the child. The juvenile court's findings do not support its concerns. "In

---

[6]The "hoarding" evidence could also indicate the child was being properly fed when the mother had weekend visitation but was being overfed at the paternal grandfather and N.S.'s house.

a dependency proceeding, the evidence must clearly and convincingly establish that the child is dependent <u>at the time of the disposition</u>." <u>J.P. v. D.P.</u>, 260 So. 3d 862, 871 (Ala. Civ. App. 2018) (emphasis added). The mother had stable housing and employment. The mother had sole custody of another child, the youngest child. The mother continued to seek a relationship with the child. While the mother does not have the financial resources that the paternal grandfather and N.S. have, there was insufficient evidence that the mother could not provide for the child. <u>Cf.</u> <u>B.O. v. C.T.</u>, [Ms. CL-2024-0320, Nov. 8, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024) (concluding, in a dependency case, that the grandparents' limited financial means had not prevented them from adequately parenting the child).

This court has reviewed the record to determine whether the juvenile court could properly have determined from the evidence presented to it that the child was dependent. Even indulging the presumption in favor of the juvenile court's findings, we conclude that clear and convincing evidence to support a finding of dependency is absent. Parents and children have a fundamental right to maintain their relationship that does not evaporate simply because the parents "have

lost temporary custody of their child." <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). This is especially true where the parent's initial loss of custody was based on judicial error.

The juvenile court's second dependency judgment is, for the foregoing reasons, due to be reversed. The cause is again remanded for the entry of a judgment of dismissal.

REVERSED AND REMANDED.

Moore, P.J., and Edwards and Lewis, JJ., concur.

Fridy, J., concurs in the result, without opinion.